## APPEALS OF GILBERT BUTLER AND FRANCES A. F. SALTONSTALL.

Docket Nos. 3118, 3117.   Decided August 6, 1926.

1. The petitioners acquired property by gift made prior to March 1, 1913, and now claim a loss as the result of its sale or other disposition. *Held*, that the loss, if any, can not be determined in the absence of proof of value at the date of acquisition.

2. *Held*, that the March 1, 1913, value of the lessors' (petitioners') interest in a certain mine was its actual value on that date and that such value may not be based upon the value of the

interest which the court in 1919 held to have been vested in them in 1913.

3. The petitioners in 1913 had a claim against the Delaware & Hudson Co. upon which they realized in 1919. *Held,* that in the absence of proof of the March 1, 1913, value of the claim, the entire amount realized was income at the time it was collected.

4. Where a mine is leased for a term equal to the life of the mine and the lessee makes certain improvements or does certain development work and, subsequently and prior to the exhaustion of the mine or the termination of the lease, the lease is forfeited, *held,* that the value of such improvements or development work is income on the date of the termination of the lease.

5. March 1, 1913, value of lessors' interest in mine determined; amount of income realized on settlement of litigation determined; value of assets exchanged for stock in 1919 determined; and from the foregoing the amount of the net additions to gross income determined.

*Warren Motley, Esq.,* and *Edward C. Thayer, Esq.,* for the petitioners.

*Robert A. Littleton, Esq.,* and *L. C. Mitchell, Esq.,* for the Commissioner.

Before MARQUETTE, GREEN, LOVE, and MORRIS.

Both of these appeals involve income taxes for the year 1919. The Commissioner determined a deficiency in the Butler appeal of $6,225.54, and in the Saltonstall appeal of $76,925.76. The issues in the appeals are precisely the same, namely—the amount of gain, if any, realized by the taxpayers upon the disposition of an interest in a certain coal mine, and the amount of income, if any, realized on the settlement of certain litigation growing out of the leasing of the mine. Each acquired his interest prior to March 1, 1913, by gift or inheritance, and each in 1919 exchanged his interest for stock or securities.

### FINDINGS OF FACT.

In 1861, Henry B. Rockwell, being then the owner of a tract of coal land consisting of 336 acres located on the outskirts of the City of Scranton, Pa., and known as the Legitt's Creek Coal Mine, entered into an agreement or lease with the Delaware & Hudson Co. whereby that company was granted the right to mine and remove coal therefrom, for which it agreed to pay the lessor or his representative a royalty of 12 cents per ton for all coal above the size of chestnut, and to pay all taxes assessed against the land, which taxes, for the four years preceding 1913, averaged approximately $6,000 per annum. The lease contained provisions as to the minimum amount of coal to be mined annually; measurement and weighing of coal; and time and method of making payment therefor.

Rockwell thereafter transferred the property, subject to the lease, to one Gilbert, who died at a time not disclosed by the record, and this property passed to his heirs of whom the taxpayers are two.

The Gilbert heirs were not satisfied with the methods adopted by the Delaware & Hudson Co. and the interpretation placed upon the lease by that company, it being their contention that the provision of the lease regarding the mining of a minimum amount of coal had been disregarded and that they were entitled under the lease to substantial royalties which had not been paid. Sometime in 1909 the heirs formed a committee and appointed a representative with instructions to him to employ competent engineers and legal counsel and determine what procedure was advisable. The representative conducted the investigation and determined that the lease had been breached in several material particulars, and made demand upon the Delaware & Hudson Co. for compliance with, or cancellation of, the lease. Not having been able to adjust the matter satisfactorily, the representative, on behalf of the Gilbert heirs, commenced an action in equity in the Supreme Court of the State of New York on May 2, 1913. A referee was appointed and on September 21, 1918, he filed his report, which report was adopted by the court, and judgment in accordance therewith was entered on September 24, 1918. This judgment canceled and set aside the contract or lease and decreed that the title to the coal in the mines remain in the lessors; that the heirs were the owners of the coal unmined on January 1, 1913; that the company on or before May 2, 1913, had breached the covenants and conditions of said lease; that by reason of said breaches thereof the heirs had the right to elect to forfeit such lease; that the company had converted to its own use such coal of the size of chestnut or under as it had removed from the mine; and that it was liable to said heirs in the sum of $317,699.19, together with interest thereon from the 31st day of December, 1912, by reason of having so appropriated the coal of the size of chestnut or under. It was further provided in said decree that the plaintiffs therein were entitled to an accounting of the operation of said mine from and after May 2, 1913. From this judgment both parties appealed.

Both appeals were dismissed as the result of the settlement effected March 31, 1919, by the terms of which the company conveyed to the heirs all the removable equipment being used with the mine and quit-claimed to them all their right, title and interest in and to said mine, and the heirs caused a satisfaction of the money judgment to be entered and waived and abandoned their rights to an accounting.

Thereafter, and until October 21, 1919, the Delaware & Hudson Co. operated the mine for and on behalf of the heirs, and on said last mentioned date the whole thereof, as of August 15, 1919, was

conveyed to a corporation known as the Legitt's Creek Anthracite Co., which had been organized by the heirs for the purpose of taking over all their right, title and interest in and to the coal mines.

As the result of services rendered in connection with the investigation and litigation above referred to, the heirs became indebted to certain attorneys, engineers, and others, and in satisfaction of such obligations caused the corporation to issue to the persons rendering such services certain of its securities. We have fixed the total value of these securities at $1,103,318.79. At the time of the organization there was paid in to the corporation, by persons not theretofore interested in the property, the sum of $150,000 in cash, and securities of the corporation were issued therefor.

At the time of the organization of the corporation the following securities were issued:

| | |
|---|---|
| 7% notes secured by mortgage, face value | $650,000 |
| 10,000 shares, 7% preferred stock, par value | 1,000,000 |
| 15,000 shares of common stock, par value | 1,500,000 |
| Of the above, there was issued for $150,000 in cash: | |
|     Preferred stock, par value | 150,000 |
|     Common stock, par value | 1,075,000 |
| To attorneys, engineers, and others, for services rendered Gilbert heirs: | |
|     Notes, face value | 373,700 |
|     Preferred stock, par value | 561,000 |
|     Common stock, par value | 280,500 |
| To the Gilbert heirs, in exchange for mine and equipment: | |
|     Notes, face value | 276,300 |
|     Preferred stock, par value | 289,000 |
|     Common stock, par value | 144,500 |

Prior to the transfer of the mine and equipment to the Legitt's Creek Anthracite Co., Butler and Saltonstall owned, respectively, a one-sixteenth and a one-eighth interest therein, and each received on the exchange of assets for securities, respectively, a one-sixteenth and a one-eighth interest in the securities issued to the Gilbert heirs.

In the deficiency letter addressed to Butler, the Commissioner set out his computation of taxable gain as follows:

*Rockwell heirs*

| | |
|---|---|
| Value of assets, Aug. 15, 1919 | $1,721,440.02 |
| Value of assets, Mar. 1, 1913, and cost | 550,539.32 |
| Profit, 1919 | 1,170,900.70 |
| Back royalty income, 1919 | 144,934.43 |
| Total taxable income, 1919 | 1,315,835.13 |

The Legitt's Creek Mine is located in the Wyoming Anthracite Basin. This basin is from two to six miles in width and extends

from Shickshinny to Forest City, Pa., a distance of approximately 60 miles. All the coal in the basin is of the same general character and the mining operations throughout the basin are carried on in a similar way.

The mine lies beneath a portion of the City of Scranton. It is approximately a mile and three-quarters in length and varies in width from 400 to 2,000 feet. Two streams, the Lackawanna River and Legitt's Creek, pass over the property. Practically all of the surface has been subdivided into streets, blocks, and lots, and buildings and other improvements have been erected thereon. Some four acres of the surface are occupied by a cemetery.

The lease, hereinbefore referred to, was made on the 12th day of November, 1861, between Henry B. Rockwell, as party of the first part, and the Delaware & Hudson Canal Co., as party of the second part. The Delaware & Hudson Canal Co. was succeeded as lessee by the Delaware & Hudson Co. The lease provided, among other things, that the lessee should mine, in 1868 and subsequent years, 150,000 tons per year, or, in event of failure to mine such amount of coal, it should pay for that amount at the royalty rates specified therein. It was further provided that the lessee should pay for the coal mined and taken out at the rate of 12 cents for every ton of 2,240 pounds of clean, merchantable coal, exclusive of chestnut coal, or any coal that would pass through a mesh of one inch square, and that if in any year the lessee should elect to take all coal as it came from the mine without it being screened or broken and prepared, they should have the right to take the same upon the payment to the lessor of 9 cents for every ton of 2,464 pounds. The lease also contained a provision that, in the event the coal of the size of chestnut should exceed 25 per cent of the total amount of coal, including chestnut, the lessee should pay for such excess chestnut coal at the rate of 12 cents per ton.

From all of the evidence we conclude that there was in the mine on March 1, 1913, 9,400,000 tons (all sizes) of coal which were recoverable. The mine as then equipped and operated was capable of producing 300,000 tons (all sizes) per year, and based upon the recoverable tonnage and yearly production, above set out, would have a life of 30 years. The lease provided for a 12 cent royalty on all coal above the size of chestnut. For the purposes of this case only, we find that 60 per cent of the recoverable coal was above the size of chestnut and that the total recoverable coal above that size was 5,640,000 tons. This amount of recoverable coal at a royalty rate of 12 cents would return over the 30-year period gross royalties of $676,800. From this amount there should be deducted the sum of

$180,000, representing the estimated taxes on the land, at the rate of $6,000 per year for 30 years, leaving estimated future net royalties of $496,800. The March 1, 1913, value of the right to receive the aforementioned net royalties was $212,770.99. The depletion allowance under the lease (which includes only coal above the size of chestnut), based upon the above valuation, is $.037725 per ton. The surface rights of the lessors had on March 1, 1913, a fair market value of $28,460.

During the period from March 1, 1913, to August 15, 1919, there were mined out 1,427,937 tons of coal. (The record is silent as to the royalties paid therefor and we have assumed that the amount fixed by the compromise was arrived at without regard to them.) Sixty per cent of the coal so mined was above the size of chestnut and the lessors were entitled to receive royalties on 856,762 tons at the rate provided in the lease. The depletion allowance on such tonnage is $32,321.35.

On August 15, 1919, there remained in the mine 7,972,063 tons of recoverable coal. The expected average annual production was 300,000 tons and the remaining life of the mine 27 years.

The Commissioner, in determining the value of the coal on August 15, 1919, made his computation on the operating profits basis, using one dollar per ton as the average expected profit, and reduced the total expected profit over the life of the mine to its present value by the application of Hoskold's formula, using a 6 per cent discount rate. The operating profit from this mine for several years prior to August 15, 1919, ranged from 70 cents to 80 cents per ton, with an average of 75 cents per ton, which we find to be the correct factor to be applied in making the computation. From the foregoing we find the present worth of the coal and improvements on August 15, 1919, to have been $2,725,877.54.

The value of the plant and equipment on August 15, 1919, was $425,000. On the same date the development had a value of $160,000. To continue production it will be necessary to make an annual capital expenditure over two-thirds of the remaining life of the mine. The Commissioner computed the present worth of this expenditure to be $352,632.72, and this amount to us seems reasonable. The total of these amounts, $937,632.72, we subtract from the present worth of the coal.

To the value of the coal thus obtained we add the value of plant and equipment development, surface right of the value of $28,460, (which we find to be correct) and arrive at a total value of assets on August 15, 1919, of $2,401,704.82.

The net profit from the transaction we arrive at by the following computation:

| | | |
|---|---|---|
| Lessors' interest in coal, Mar. 1. 1913 | | $212, 770. 99 |
| Value of surface, Mar. 1, 1913 | | 28, 460. 00 |
| Mar. 1, 1913, value | | 241, 230. 99 |
| Additions: | | |
| Improvements | $425, 000. 00 | |
| Development | 160, 000. 00 | |
| Paid engineers | 1, 103, 318. 79 | |
| | | 1, 688, 318. 79 |
| Total Mar. 1, 1913, value and additions | | 1, 929, 549. 78 |
| Less depletion on tonnage removed since Mar. 1, 1913 | | 32, 321. 35 |
| Value plus additions | | 1, 897, 228. 43 |
| Aug. 15, 1919, value | | 2, 401, 704. 82 |
| Less Mar. 1, 1913, value and additions | | 1, 897, 228. 43 |
| Taxable profit | | 504, 476. 39 |

During the year 1919 and prior to August 15, the lessee paid to the lessors, as royalties for coal removed during the period, the sum of $5,940.07, which, after deducting depletion at the rate heretofore fixed, left as taxable income therefrom the sum of $4,072.66.

The record contains no evidence of the value of the mine or of the interests of the taxpayers therein at the date on which they acquired their interests. It is equally silent as to the value, if any, on March 1, 1913, of the claim of the lessors against the Delaware & Hudson Co.

OPINION.

GREEN: Numerous questions are presented by these appeals. Many of these are questions of fact. It is necessary, in this opinion to discuss only those questions which are properly questions of law or which require our conclusion as to the correct legal principle to be applied in making our finding of ultimate fact. The taxpayers contend that they have sustained losses as the result of their acquisition and disposition of their interests in the mining property. We have heretofore held in the *Appeal of Anniston City Land Co.*, 2 B. T. A. 526, that in order to ascertain the amount of loss realized on the disposition of assets acquired prior to March 1, 1913, the claimant must prove cost, March 1, 1913, value, and sale price. The same rule is applicable here. The taxpayers acquired their interests by inheritance, and without the proof of value at the date of acquisition we are without one of the necessary factors. It may be that the sale price (using that term to describe the value of the securities received in exchange) is less than the value at the date of acquisition though greater than the March 1, 1913, value. An application of the

Regulations to such a state of facts would result in a determination of no taxable gain. However, since the pleadings and proof disregard the value at the date of acquisition, we must limit our consideration and determination.

The taxpayers contend that they are entitled to have a March 1, 1913, valuation based upon the decree of court rendered in 1919, confirming the rights of the lessors asserted before and made the basis of an equitable action shortly after March 1, 1913. In the *Appeal of Charles P. Hewes*, 2 B. T. A. 1279, we had before us a similar question and determined the value as of March 1, 1913, upon the proof of the actual value at that time. We find no justification for the taxpayer's position and have based our conclusion upon the evidence of the value of the lessors' interest in its then condition.

All of the rights and interests which vested in the lessors as the result of the decree were by them exchanged for the improvements in and on the mine which, by the terms of the lease, remained the property of the lessee. The value of these rights and interests so acquired we have treated as a part of the cost for the purpose of determining gain. It was in fact a capital expenditure subsequent to acquisition.

All of the rights and interests vested in the lessors by the decree grow out of a claim existing against the lessee prior to March 1, 1913. A careful examination of the evidence discloses no proof that this claim had any value on March 1, 1913, and we therefore must hold that all that the lessors received in satisfaction of such claim was income to them when received in 1919. The lessors received, exclusive of development work hereinafter referred to, assets of the value of $425,000. This conclusion is in accord with the principles of *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179.

Included among assets acquired on the settlement was the development work done in the mine. This, when received, had a value of $160,000. This development work is in the nature of an improvement. It was placed in the mine by the lessee. Such an improvement, consisting of shafts, tunnels, and the like, is irremovable and there was no occasion for limiting its removal by the terms of the lease. Commonly, permanent improvements placed upon leased property by the lessee result immediately in income to the lessor. See *Miller* v. *Gearin* (C. C. A.), 258 Fed. 225; *Cryan* v. *Wardell*, 263 Fed. 248. However, if the life of the improvement is less or only equal to the term of the lease, the Bureau of Internal Revenue has always conceded that no income resulted until the lessor acquired the possession and beneficial use thereof. This we believe to be the correct rule and, accordingly, hold that the value of the development work ($160,000) was income to the lessors when received by them in 1919.

The decree provided for the payment of interest which, if it had been paid, would constitute income. The right to receive such interest was a part of the consideration paid on the settlement for the transfer of all the improvements in the mine; and, since we hold that the entire value of the improvements is income in 1919, there is no occasion to give further consideration to the interest item. There was no change in the value of the assets acquired in the settlement on March 31, 1919, between the date of their acquisition and the exchange thereof for stock and securities on October 21, 1919.

The payment made to the engineers and others by the corporation for and on behalf of the lessors was a capital expenditure and the value of the securities so paid out has been added to the March 1, 1913, value in the computation of gain or loss. Whether the payment be treated as a capital expenditure or a business expense is for our purposes a matter of no consequence, for the effect on taxable income is identical. There is little evidence of the values of the various classes of securities, but since the October 21, 1919, value of the mine and improvements is considerably in excess of the total of the collateral notes and preferred stock issued, we, for the purpose of computing the value of the securities issued to the engineers and others, and for such purpose only, assign to the preferred stock a value of $100 and the common stock a value of $60.11365 per share. Upon these valuations the securities so paid had a total value of $1,103,318.79.

The values so placed upon the securities paid out can be, at best, only estimates which we are compelled to use for want of definite information. It is unnecessary and inadvisable to use such values in determining the taxable gain to the taxpayers, for the reason that each had a specific interest in the entire assets and received a like proportion of the taxable gain.

The taxpayers insist that the October 21, 1919, value should be computed upon a royalty basis and the evidence of both the taxpayers and the Commissioner as to the average royalty at that time is more or less in harmony. The Rockwell heirs, however, were on that date in complete possession and control of the property and had, therefore, an interest greater than that of a lessor. Their interest was that of both lessor and lessee. In such case the operating profits basis may properly be used. The Commissioner chose such basis but used as one of his factors an operating profit of $1 per ton. This factor was based upon subsequent operating profits. We are of the opinion that only prior operating profits may be used and that subsequent operating profits may be used only as a check or as corroboration. One of the Commissioner's witnesses, a valuation engineer,

testified that in his judgment the operating profits per ton, during the years from 1913 to 1919, ranged from 70 cents to 80 cents per ton. This we believe to be approximately correct and have chosen and applied 75 cents per ton as the proper factor. This factor reduced to its present worth and applied to the expected recoverable tonnage (with minor additions for expected expenditures, etc.) gives the value of the coal which we have found.

The Rockwell heirs, collectively, realized in 1919, as set out in the findings of fact, as the result of their acquisition and disposition of the mine, a taxable gain of $504,476.39. In addition they received income in the sum of $589,072.66, which is arrived at by adding together the following items: $425,000, value of plant and equipment; $160,000, value of development work (both items being received during the taxable year as the result of the settlement); and $4,072.66, net income from royalties. Together the two items total $1,093,549.05. Dividing this amount by one-eighth in the case of Saltonstall and one-sixteenth in the case of Butler, we find that they should add to their gross income the amounts of $136,693.63 and $68,346.82, respectively.

> *Order of redetermination will be entered on*
> *15 days' notice, under Rule 50.*

SMITH and TRUSSELL dissent.