*762 OPINION.
Geeen
: Numerous questions are presented by these appeals. Many of these are questions of fact. It is necessary, in this opinion to discuss only those questions which are properly questions of law or which require our conclusion as to the correct legal principle to be applied in making our finding of ultimate fact. The taxpayers contend that they have sustained losses as the result of their acquisition and disposition of their interests in the mining property. We have heretofore held in the Appeal of Anniston City Land Co., 2 B. T. A. 526, that in order to ascertain the amount of loss realized on the disposition of assets acquired prior to March 1, 1913, the claimant must prove cost, March 1, 1913, value, and sale price. The same rule is applicable here. The taxpayers acquired their interests by inheritance, and without the proof of value at the date of acquisition we are without one of the necessary factors. It may be that the sale price (using that term to describe the value of the securities received in exchange) is less than the value at the date of acquisition though greater than the March 1, 1913, value. An application of the *763 -Regulations to such a state of facts would result in a determination of no taxable gain. However, since the pleadings and proof disregard the value at the date of acquisition, we must limit our consideration and determination.
The taxpayers contend that they are entitled to have a March 1, 1913, valuation based upon the decree of court rendered in 1919, confirming the rights of the lessors asserted before and made the basis of an equitable action shortly after March 1, 1913. In the Appeal of Charles P. Hewes, 2 B. T. A. 1279, we had before us a similar question and determined the value as of March 1, 1913, upon the proof of the actual value at that time. We find no justification for the taxpayer’s position and have based our conclusion upon the evidence of the value of the lessors’ interest in its then condition.
All of the rights and interests which vested in the lessors as the result of the decree were by them exchanged for the improvements in and on the mine which, by the terms of the lease, remained the property of the lessee. The value of these rights and interests so acquired we have treated as. a part of the cost for the purpose of determining gain. It was in fact a capital expenditure subsequent to acquisition.
All of the rights and interests vested in the lessors by the decree grow out of a claim existing against the lessee prior to March 1, 1913. A careful examination of the evidence discloses no proof that this claim had any value on March 1, 1913, and we therefore must hold that all that the lessors received in satisfaction of such claim was income to them when received in 1919. The lessors received, exclusive of development work hereinafter referred to, assets of the value of $425,000. This conclusion is in accord with the principles of Doyle v. Mitchell Brothers Co., 247 U. S. 179.
Included among assets acquired on the settlement was the development work done in the mine. This, when received, had a value of $160,000. This development work is in the nature of an improvement. It was placed in the mine by the lessee. Such an improvement, consisting of shafts, tunnels, and the like, is irremovable and there was no occasion for limiting its removal by the terms of the lease. Commonly, permanent improvements placed upon leased property by the lessee result immediately in income to the lessor. See Miller v. Gearin (C. C. A.), 258 Fed. 225; Cryan v. Wardell, 263 Fed. 248. However, if the life of the improvement is less or only equal to the term of the lease, the Bureau of Internal Revenue has always conceded that no income resulted until the lessor acquired the possession and beneficial use thereof. This we believe to be the correct rule and, accordingly, hold that the value of the development work ($160,000) was income to the lessors when received by them in 1919,
*764 The decree provided for the payment of interest which, if it had been paid, would constitute income. The right to receive such interest was a part of the consideration paid on the settlement for the transfer of all the improvements in the mine; and, since we hold that the entire value of the improvements is income in 1919, there is no occasion to give furthér consideration to the interest item. There was no change in the value of the assets acquired" in the settlement on March 31, 1919, between the date of their acquisition and the exchange thereof for stock and securities on October 21, 1919.
The payment made to the engineers and others by the corporation for and on behalf of the lessors was a capital expenditure and the value of the securities so paid out has been added to the March 1, 1913, value in the computation of gain or loss. Whether the payment be treated as a capital expenditure or a business expense is for our purposes a matter of no consequence, for the effect on taxable income is identical. There is little evidence of the values of the various classes of securities, but .since the October 21, 1919, value of the mine and improvements is considerably in excess of the total of the collateral notes and preferred stock issued, we, for the purpose of computing the value of the securities issued to the engineers and others, and for such purpose only, assign to the preferred stock a value of $100 and the common stock a value of $60.11365 per share. Upon these valuations the securities so paid had a total value of $1,103,318.79.
The values so placed upon the securities paid out can be, at fiest, only estimates w-hich we are compelled to use for want, of definite information. It is unnecessary and inadvisable to use such values in determining the taxable gain to the taxpayers, for the reason that each had a-specific interest in the entire assets and received a like proportion of the taxable gain.
The taxpayers insist that the October 21, 1919, value should be computed upon a royalty basis and the evidence of both the taxpayers and the Commissioner as to the average royalty at that time is more or less in harmony. The Kockwell heirs, however, were on that date in complete possession and control of the property and had, therefore, an interest greater than that of a lessor. Their interest was that of both lessor and lessee. In such case the operating profits basis may properly be used. The Commissioner chose such basis but used as one of his factors an operating profit of $1 per ton. This factor was based upon subsequent operating profits. We are of the opinion that only prior operating profits may be used and that subsequent operating profits may be used only as a check or as corroboration, On? of the Commissioner’s witnesses, a valuation engineer, *765 testified that in his judgment the operating profits per ton, during the years from 1913 to 1919, ranged from 70 cents to 80 cents per ton. This we believe to be approximately correct and have chosen and applied 75 cents per ton as the proper factor. This factor reduced to its present worth and applied to the expected recoverable tonnage (with minor additions for expected expenditures, etc.) gives the value of the coal which we have found.
The Rockwell heirs, collectively, realized in 1919, as set out in the findings of fact, as the result of their acquisition and disposition of the mine, a taxable gain of $501,476.39. In addition they received income in the sum of $589,072.66, which is arrived at by adding together the following items: $425,000, value of plant and equipment; $160,000, value of development work (both items being received during the taxable year as the result of the settlement); and $4,072.66, net income from royalties. Together the two items total $1,093,549.05. Dividing this amount by one-eighth in the case of Saltonstall and one-sixteenth in the case of Butler, we find that they should add to their gross income the amounts of $136,693.63 and $68,346.82, respectively.
Order of redetermination will he entered on 15 days' notice, under Bule 50.
Smith and Trussell dissent.