DOYLE, COLLECTOR OF INTERNAL REVENUE,
v. MITCHELL BROTHERS COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
SIXTH CIRCUIT.

No. 492. Argued March 4, 5, 6, 1918.—Decided May 20, 1918.

The purpose of the Corporation Tax Act of August 5, 1909, c. 6, 36 Stat. 11, 112, § 38, is not to tax property as such, or the mere conversion of property, but to tax the conduct of the business of corporations organized for profit by a measure based upon the gainful returns from their business operations and property from the time the act took effect.

The act employs the term "income" in its natural and obvious sense, as importing something distinct from principal or capital, and conveying the idea of gain or increase arising from corporate activities.

While a conversion of capital may result in income, in the sense of the act, where the proceeds include an increment of value, such is not the case where the increment existed when the act took effect.

In distinguishing preexisting capital from income subject to the act, it is a mere question of method whether a deduction be made from gross receipts in ascertaining gross income, or from gross income, by way of depreciation, in ascertaining net income.

Before the Corporation Tax Act, a lumber company bought timber land

to supply its mills, and after the act it manufactured part of the timber into lumber, which it sold. *Held*, that the amount by which the timber so used had increased in value between the date of purchase and the effective date of the act was not an element of income to be considered in computing the tax:

The principle upon which the removal of minerals by mining companies has been held not to produce a depreciation within the meaning of the act is inapplicable to the case of a company engaged in the business of manufacturing and selling lumber from timber supplied by its own timber lands, and which sells the lands incidentally after the timber is removed.

The income is to be determined from the actual facts, as to which the corporate books are only evidential.

235 Fed. Rep. 686, affirmed.

THE case is stated in the opinion.

*The Solicitor General*, with whom *Mr. Wm. C. Herron* was on the brief, for petitioner.

*Mr. Mark Norris*, with whom *Mr. Oscar E. Waer* was on the brief, for respondent.

*Mr. Robert R. Reed*, by leave of court, filed a brief on behalf of the Investment Bankers' Association of America, as *amicus curiæ*.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an action to recover from the Collector additional taxes assessed against the respondent under the Corporation Excise Tax Act of August 5, 1909, c. 6, 36 Stat. 11, 112, § 38, and paid under protest. The District Court gave judgment for the plaintiff, which was affirmed by the Circuit Court of Appeals (225 Fed. Rep. 437; 235 Fed. Rep. 686), and the case comes here on certiorari.

It was submitted at the same time with several other cases decided this day, arising under the same act.

The facts are as follows: Plaintiff is a lumber man-ufacturing corporation which operates its own mills, manufactures into lumber therein its own stumpage, sells the lumber in the market, and from these sales and sales of various by-products makes its profits, declares its dividends, and creates its surplus. It sells its stumpage lands, so-called, after the timber is cut and removed. Its sole business is as described; it is not a real estate trading corporation. Plaintiff acquired certain timber lands at its organization in 1903 and paid for them at a valuation approximately equivalent to $20 per acre. Owing to increases in the market price of stumpage the market value of the timber land, on December 31, 1908, had become approximately $40 per acre.[1] The company made no entry upon its books representing this increase, but each year entered as a profit the difference between the original cost of the timber cut and the sums received for the manufactured product, less the cost of manufacture. After the passage of the Excise Tax Act, and preparatory to making a return of income for the year 1909, the com-pany revalued its timber stumpage as of December 31, 1908, at approximately $40 per acre. The good faith and accuracy of this valuation are not in question, but the figures representing it never were entered in the corporate books.

Under the act the company made a return for each of the years 1909, 1910, 1911, 1912, and in each instance deducted from its gross receipts the market value, as of December 31, 1908, of the stumpage cut and converted during the year covered by the tax. There appears to have been no change in its market value during these years.

The Commissioner of Internal Revenue having al-

---

[1] The valuations were based upon the quantity of standing timber, at certain prices per thousand feet for the different varieties. The approximate acreage equivalent is employed for convenience.

lowed a deduction of the cost of the timber in 1903 and
refused to allow the difference between that cost and the
fair market value of the timber on December 31, 1908,
the question is whether this difference (made the basis of
the additional taxes) was income for the years in which
it was converted into money, within the meaning of the
act.

Other items are involved in the case, arising from the
sale of certain stump lands, certain by-products, and a
parcel of real estate, but they raise no different question
from that which arises upon the valuation of the stump-
age, and need not be further mentioned.

The act became effective January 1, 1909, and pro-
vided for the annual payment by every domestic cor-
poration "organized for profit and having a capital stock
represented by shares" of an excise tax "equivalent to
one per centum upon the entire net income over and
above five thousand dollars received by it from all sources
during such year," with exceptions not now material. It
declared that such net income should be ascertained by
deducting from the gross income received within the year
from all sources the expenses paid within the year out of
income in the maintenance and operation of business and
property, including rentals and the like; losses sustained
within the year and not compensated by insurance or
otherwise, including a reasonable allowance for depreci-
ation of property; interest paid within the year to a lim-
ited extent; taxes; and amounts received within the year
as dividends upon stock of other corporations subject to
the same tax. In the case of a corporation organized
under the laws of a foreign country, the net income was
to be ascertained by taking into account the gross income
received within the year "from business transacted and
capital invested within the United States and any of its
Territories, Alaska, and the District of Columbia," with
deductions for expenses of maintenance and operation,

business losses, interest, and taxes, all referable to that portion of its business transacted and capital invested within the United States, etc.

An examination of these and other provisions of the act makes it plain that the legislative purpose was not to tax property as such, or the mere conversion of property, but to tax the conduct of the business of corporations organized for profit by a measure based upon the gainful returns from their business operations and property from the time the act took effect. As was pointed out in *Flint v. Stone Tracy Co.*, 220 U. S. 107, 145, the tax was imposed "not upon the franchises of the corporation irrespective of their use in business, nor upon the property of the corporation, but upon the doing of corporate or insurance business and with respect to the carrying on thereof;" an exposition that has been consistently adhered to. *McCoach* v. *Minehill & Schuylkill Haven Railway Co.*, 228 U. S. 295, 300; *United States* v. *Whitridge*, 231 U. S. 144, 147; *Anderson* v. *Forty-two Broadway Co.*, 239 U. S. 69, 72.

When we come to apply the act to gains acquired through an increase in the value of capital assets acquired before and converted into money after the taking effect of the act, questions of difficulty are encountered. The suggestion that the entire proceeds of the conversion should be still treated as the same capital, changed only in form and containing no element of income although including an increment of value, we reject at once as inconsistent with the general purpose of the act. Selling for profit is too familiar a business transaction to permit us to suppose that it was intended to be omitted from consideration in an act for taxing the doing of business in corporate form upon the basis of the income received "from all sources."

Starting from this point, the learned Solicitor General has submitted an elaborate argument in behalf of the

Government, based in part upon theoretical definitions of "capital," "income," "profits," etc., and in part upon expressions quoted from our opinions in *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 147, and *Anderson* v. *Forty-two Broadway Co.*, 239 U. S. 69, 72, with the object of showing that a conversion of capital into money always produces income, and that for the purposes of the present case the words "gross income" are equivalent to "gross receipts"; the insistence being that the entire proceeds of a conversion of capital assets should be treated as gross income, and that by deducting the mere cost of such assets we arrive at net income. The cases referred to throw little light upon the present matter, and the expressions quoted from the opinions were employed by us with reference to questions wholly remote from any that is here presented.

The formula that the entire receipts derived from a conversion of capital assets after deducting cost value must be treated as net income, so far as it is applied to a conversion of assets acquired before the act took effect and so as to tax as income any increased value that accrued before that date, finds no support in either the letter or the spirit of the act, and brings the former into incongruity with the latter. If the gross receipts upon such a conversion are to be treated as gross income, what authority have we for deducting either the cost or the previous market value of the assets converted in order to arrive at net income? The deductions specifically authorized are only such as expenses of maintenance and operation of the business and property, rentals, uncompensated losses, depreciation, interest, and taxes. There is no express provision that even allows a merchant to deduct the cost of the goods that he sells.

Yet it is plain, we think, that by the true intent and meaning of the act the entire proceeds of a mere conversion of capital assets were not to be treated as income.

Whatever difficulty there may be about a precise and scientific definition of "income," it imports, as used here, something entirely distinct from principal or capital either as a subject of taxation or as a measure of the tax; conveying rather the idea of gain or increase arising from corporate activities.  As was said in *Stratton's Independence v. Howbert*, 231 U. S. 399, 415: "Income may be defined as the gain derived from capital. from labor, or from both combined."

Understanding the term in this natural and obvious sense, it cannot be said that a conversion of capital assets invariably produces income.  If sold at less than cost, it produces rather loss or outgo.  Nevertheless, in many if not in most cases there results a gain that properly may be accounted as a part of the "gross income" received "from all sources"; and by applying to this the authorized deductions we arrive at "net income."  In order to determine whether there has been gain or loss, and the amount of the gain, if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration.

This has been recognized from the beginning by the administrative officers of the Government.  Shortly after the passage of the act, and before the time (March 1, 1910) for making the first returns of income, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, promulgated Regulations No. 31, under date December 3, 1909, for the guidance of collectors and other subordinate officers in the performance of their duties under the act.  These prescribed, with respect to manufacturing companies, that gross income should consist of the difference between the price received for the goods as sold and the cost of such goods as manufactured; cost to be "ascertained by an addition of a charge to the account of the cost of goods as

manufactured during the year of the sum of the inventory
at beginning of the year and a credit to the account of
the sum of the inventory at the end of the year." In
the case of mercantile companies, gross income was to
be the "amount ascertained through inventory, or its
equivalent, which shows the difference between the
price received for goods sold and the cost of goods pur-
chased during the year, with an addition of a charge to
the account of the sum of the inventory at beginning of
the year and a credit to the account of the sum of the
inventory at the end of the year." And as to miscella-
neous corporations, gross income was to be "the gross
revenue derived from the operation and management of
the business and property of the corporation," with all
income derived from other sources. The matter of in-
come arising from a profitable sale of capital assets was
dealt with specifically in such a way as to limit the tax to
income arising after the effective date of the act. This
was done by adopting the rule that an advance in value
arising during a period of years should be so adjusted
that only so much as properly was attributable to the time
subsequent to January 1, 1909, (December 31, 1908,
would have been more precise), should be subjected to
the tax.[1]  Subsequent treasury regulations, promul-
gated from time to time (T. D. 1606, March 29, 1910,

---

[1] Extract from Treasury Regulations No. 31, issued December 3, 1909.

Sale of capital assets.—In ascertaining income derived from the sale
of capital assets, if the assets were acquired subsequent to January 1,
1909, the difference between the selling price and the buying price shall
constitute an item of gross income to be added to or subtracted from
gross income according to whether the selling price was greater or less
than the buying price.  If the capital assets were acquired prior to
January 1, 1909, the amount of increment or depreciation representing
the difference between the selling and buying price is to be adjusted so
as to fairly determine the proportion of the loss or gain arising subse-
quent to January 1, 1909, and which proportion shall be deducted from
or added to the gross income for the year in which the sale was made.

paragraphs 40, 71, 76; T. D. 1675, February 14, 1911, paragraphs 37, 55, 75; T. D. 1742, December 15, 1911, paragraphs 43, 62, 86, 91,) adhered to the same rule with respect to lands bought prior to January 1, 1909, and sold during a subsequent year, prescribing, however, that the profits, when not otherwise accurately determinable, should be prorated according to the time elapsed before and after the act took effect; and gave to it an application especially pertinent here, one of the regulations reading: "The mere removal of timber by cutting from timber lands, unless the timber is otherwise disposed of through sales or plant operations, is considered simply a change in form of assets. If said timber is disposed of through sales or otherwise it is to be accounted for in accordance with regulations governing disposition of capital and other assets."

In our opinion these regulations correctly interpret the act in its application to the facts of the present case. When the act took effect, plaintiff's timber lands, with whatever value they then possessed, were a part of its capital assets, and subsequent change of form by conversion into money did not change the essence. Their increased value since purchase, as that value stood on December 31, 1908, was not in any proper sense the result of the operation and management of the business or property of the corporation while the act was in force. Nor is the result altered by the mere fact that the increment of value had not been entered upon plaintiff's books of account. Such books are no more than evidential, being neither indispensable nor conclusive. The decision must rest upon the actual facts, which in the present case are not in dispute.

The plaintiff, in making up its income tax returns for the years 1909, 1910, 1911, and 1912, deducted from its gross receipts the admittedly accurate valuation as of December 31, 1908, of the stumpage cut and converted dur-

ing the year covered by the tax. There having been no change in market values during these years, the deduction did but restore to the capital in money that which had been withdrawn in stumpage cut, leaving the aggregate of capital neither increased nor decreased, and leaving the residue of the gross receipts to represent the gain realized by the conversion, so far as that gain arose while the act was in effect. This was in accordance with the true intent and meaning of the act.

It may be observed that it is a mere question of meth- ods, not affecting the result, whether the amount necessary to be withdrawn in order to preserve capital intact should be deducted from gross receipts in the process of ascertain- ing gross income, or should be deducted from gross income in the form of a depreciation account in the process of determining net income. In either case the object is to distinguish capital previously existing from income tax- able under the act.

There is only a superficial analogy between this case and the case of an allowance claimed for depreciation of a mining property through the removal of minerals, since we have held that owing to the peculiar nature of mining property its partial exhaustion attributable to the removal of ores cannot be regarded as depreciation within the meaning of the act. *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503, 520, 524; *United States* v. *Biwabik Mining Co., ante,* 116; *Goldfield Consolidated Mines Co.* v. *Scott, ante,* 126.

It should be added that in this case no question is raised as to whether, in apportioning the profits derived from a disposition of capital assets acquired before and converted after the act took effect, the division should be *pro rata,* according to the time elapsed, or should be based upon an inventory taken as of December 31, 1908. Plaintiff, in accordance with Treasury Regulations No. 31, T. D. 1578, January 4, 1910, and T. D. 1588, January

24, 1910, adopted the latter method, and the Government makes no contention as to the accuracy of the result thereby reached, under the stipulated facts, if our construction of the act be correct.

*Judgment affirmed.*