## ELDREDGE et al. v. UNITED STATES.

Circuit Court of Appeals, Sixth Circuit.
March 23, 1929.

Nos. 5210, 5211.

Adda Eldredge, of Marquette, Mich. (Miller, Eldredge & Eldredge, of Marquette, Mich., on the brief), for appellants.

T. H. Lewis, Jr., of Washington, D. C. (Edward J. Bowman, U. S. Atty., of Grand Rapids, Mich., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for the United States.

Before MOORMAN, MACK, and HICKS, Circuit Judges.

MACK, Circuit Judge. Appeal by petitioners, executors of A. B. Eldredge, in two actions under the Tucker Act (24 Stat. 505). No. 5210 involves the taxability of sums received during the year 1917 by Eldredge under the Wakefield contract hereinafter described; No. 5211 involves the taxability of like sums received by his executors in the period between his death in 1918 and the end of that year. The material facts found by the District Court may be summarized as follows:

In 1912 the following transactions took place. The Keweenaw Land Association, Limited, gave to one Rose options for 50,-year mining leases upon lands in Gogebic county, Michigan; Rose assigned a half-interest therein to Eldredge; Rose and Eldredge transferred the options to M. A. Hanna & Co., in consideration of $1,000 cash and a promise to exercise the options, if exploration revealed a sufficient quantity of ore, and in such event to pay each of the assignors 2½ cents per ton of ore removed during the life of whatever leases were taken under the options. The options gave the holder no right to mine ore without first taking a mining lease at specified royalty terms, and no right to take a mining lease without first demonstrating by exploration the existence of an ore body of specified size neither of which things had been done by Rose and Eldredge before their assignment.

M. A. Hanna & Co., after procuring the issuance of identical options to it by the association in place of the assigned ones, transferred them to the Wakefield Iron Company, which M. A. Hanna & Co. had organized for the express purpose of exercising the options. In consideration of "the surrender of decedent's rights under the oral contract with M. A. Hanna & Co.," the Wakefield Company entered into a contract with Rose and Eldredge, herein referred to as the Wakefield contract. This contract obligated the Wakefield Company to pay Eldredge 2½ cents per ton of coal mined if it should elect to take mining leases under the options, but left it free to abandon the options or the leases taken thereunder at any time, upon offering to assign the abandoned options or leases to Rose and Eldredge.

On July 1, 1913, the Wakefield Iron Company exercised the options and took leases under which it has been mining since 1914. Between 1914 and 1917 about $44,000, pursuant to the contract, was paid to Eldredge. For the year 1917 he received $26,979.64, although he erroneously reported and was assessed at a larger sum in his income tax return, for which excess the District Court gave credit in its judgment. For the period from Eldredge's death to the end of 1918, the executors received under the Wakefield contract $12,186.16. The District Court allowed petitioners to recover the tax upon $8,430.22 of this sum, which part represented the amount that became due before Eldredge's death, but was not paid until thereafter. The District Court further found that on March 1, 1913, "the right to and the amount of money to be paid [to Rose and Eldredge] under the aforesaid contract with the Wakefield Iron Company were indeterminate and contingent upon factors and conditions not then existing. On that date it was not known and could not be shown when these contingencies would happen, or indeed that they would happen at all"; also "that the evidence in this case does not show that the decedent was engaged in the business of mining, or used or employed the contract with the Wakefield Iron Company in his trade or business, except in so far as the collecting of money thereunder may constitute as a matter of law the use of such contract in his trade or business."

The conclusions of law and the reasoning of the District Court may be summarized as follows: The options transferred to M. A. Hanna & Co. were not property, within the meaning of the statutory exemption of the value on March 1, 1913, of property thereafter sold or otherwise disposed of; but in any event there was no sale or disposition, because the transferors did not exchange their interest in the options for a new and definite consideration. They did not get an absolute price, but continued to be dependent for their receipts upon the rate and quantity of the ore mining. Therefore the payments under the contract were in the nature of royalties and consequently fully taxable. But the mere

926

fact that taxpayer's income was measured by the quantity of ore produced from land under lease between third parties cannot be held to vest taxpayer with such an ownership interest as permits an allowance for depletion or depreciation. The court assumed that payments received by the estate for ore since the death were in exactly the same situation.

■ Petitioners' exceptions and assignments of error duly raise the questions, not only whether the District Court's findings of fact support its judgment, but also whether it erred in not making further findings of facts as requested. The failure of petitioners formally to ask this court to remand the case for such further findings, supported by the evidence, as are necessary to a proper disposition of the case does not restrict us to a review of the District Court's findings actually made, especially in view of the informal request in petitioners' brief for remanding, if necessary.

Petitioners contend that the 1912 transaction, by which the taxpayer acquired the right to annual payments, was a sale of the option, and that the payments constitute installments of purchase price, not royalties; that the right to the payments was property owned on March 1, 1913, and that its value was ascertainable from the testimony. They further contend that the applicable Revenue Acts must be construed as exempting so much of the proceeds of a sale before March 1, 1913, received after that date as exceeds the value on March 1, 1913, of the right to such proceeds, and that therefore none of the payments received by taxpayer or his estate are taxable because until 1919 the payments had not yet aggregated more than the March 1, 1913, value. As to the 1918 payments to the estate a second contention is that they were less than the value as ascertainable from the record, of the decedent's contract right at the time of his death. The basis of this contention is that an estate is taxable only upon the excess of receipts over the value at death of the property disposed of. In both actions it is contended in the alternative that, if the payments should be held to be income, the taxpayer is entitled to deduct an allowance for depletion, depreciation, exhaustion, or prorated return of capital.

Appellee, on the other hand, contends that the payments were as much a gain or profit as the receipts of a lessor of mining property; even though, before March 1, 1913, there was a contingent right to payments of indefinite amounts in the indefinite future, the gain did not accrue and was not derived during the year when these expecta-

tions arose, but only when the payments were received. Appellee further urges that the statutory deduction of the March 1, 1913, value of property sold or disposed of is inapplicable in the present case, first, because it necessarily applies only to sales after March 1, 1913; second, because, if applicable, it would relate to the value of the option sold, and not of the contract right received; third, because taxpayer's contract right has not been sold or disposed of; fourth, because the March 1, 1913, value of that contract right cannot be definitely shown. As against a depletion allowance, appellee urges that the taxpayer had no interest in rem in the mine, and was not per se adversely affected by the diminution of the unmined ore. Against an exhaustion allowance, it contends, first, that the contract was not used in taxpayer's business; second, that exhaustion relates only to rights in connection with consumable physical property; third, that the value of the contract might increase, rather than diminish, during the years, if there were new ore discoveries.

■ The District Court's findings of fact, in our judgment, do not support its conclusion that the 1912 transaction, which created the right to payments, was in the nature of a royalty agreement. The options became the property of and exercisable solely by M. A. Hanna & Co. and subsequently the Wakefield Iron Company Rose and Eldredge retained nothing for which they could charge royalties. Payments measured by the yield of mining property are not necessarily royalties; they may, for example, be installments of purchase price. Compare Ruth Iron Co. v. Commissioner (C. C. A.) 26 F.(2d) 30. The cases of Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460; U. S. v. Biwabik Mining Co., 247 U. S. 116, 38 S. Ct. 462, 62 L. Ed. 1017; Stratton's Independence, Ltd., v. Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285, and Chemung Iron Co. v. Lynch (C. C. A.) 269 F. 368, are not in point. Compare Lynch v. Alworth-Stephens Co., 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660. They deal with an allowance for depletion of the mining land itself.

By virtue of a common-law tradition too old and well established to submit to analysis, the rent or produce of land is regarded in its entirety as income from the land, because after its yield the land remains, even though depleted. Similarly, in the absence of a specific statute, a deduction from gross rentals in order to restore the capital value of a favorable lease is improper, because the

rentals are not regarded as produced by the lease, but by the tangible property. In the present case, the annual payments were clearly produced by the contract. A second ground of distinction of the cases above cited is that they deal with deductions based upon the value existing at the beginning of the taxable year, not upon the March 1, 1913, value.

Appellant's arguments already outlined can be considered only in the light of certain facts in the record upon the basis of which findings were requested. Three mining experts, two called by petitioners and one by respondent, testified without contradiction that during the months preceding March 1, 1913, there had been enough drilling upon the Wakefield Company's property to make it certain, in view of the known geological conformation of the Gogebic Range, that a very large ore body existed. Respectively they testified to tonnages of assured ore and of probable ore as follows: 10,677,000 and 7,-413,000 tons; 18,090,000 and 5,000,000 tons; about 5,500,000 and 5,500,000 tons. In fact, the tonnage turned out to be greater than any of these estimates, based upon 1913 data. It was testified without contradiction by one of the founders of the Wakefield Iron Company that the exercise of the options had been definitely decided upon before March, 1913, and that it was delayed solely in order to defer the time at which minimum royalties would become payable. The solvency of the Wakefield Company was proved. The lowest estimate of the value of the contract to Eldredge on March 1, 1913, based upon data available as of that date, was $163,250, obtained by assuming 11,000,000 tons to be mined at the rate of 1,000,000 tons per year, and finding the present capital value, under Hoskold's Formula, on the basis of a return of 7 per cent. upon capital plus 4 per cent. for sinking fund. Rose testified to a value of $335,000. The value of Eldredge's contract rights at the time of his death was found for estate tax purposes to be in excess of $278,000, and the parties here stipulate to the correctness of this figure.

Appellants insist that the option was sold. Actually, however, the consideration moving from the taxpayer in the transaction with the Wakefield Company under which the right to annual payments was acquired was not the options, which had already been assigned to M. A. Hanna & Co., but the release of Rose's and Eldredge's previously existing contract rights against M. A. Hanna & Co. A novation of contract rights can hardly be called a sale by the obligee to the new obligor. Perhaps, however, the transactions with M. A. Hanna & Co. and with Wakefield Iron Company may be regarded as a single one, resulting in the exchange of Rose's and Eldredge's options for the Wakefield contract right.

We do not decide this because we hold that the 1917 payments are not to be referred to the 1912 transaction, but to the March 1, 1913, contract right. Whether there was a sale or novation in 1912 is immaterial. If the 1917 receipts have to be regarded solely as an installment due on the 1912 transaction, then, whatever the nature of that transaction, appellee would be correct in its contention that there can be no annual deductions to represent return of capital, since there is no evidence in the record establishing the value of the consideration which taxpayer parted with in 1912. But we hold that the 1917 receipts must be, or at least can be, regarded as realization upon taxpayer's contract right existing on March 1, 1913, and therefore that the question is as to the deductibility of the value of this right.

There can be no doubt that the contract right had ascertainable value on that date. The District Court should have found from the undisputed evidence that on March 1, 1913, the Wakefield company was certain to exercise its options; moreover, nonexercise would have enabled taxpayer to reacquire the option rights which by March 1, 1913, were as valuable as, and probably more valuable than, the contract right. The District Court's finding that the contract rights were wholly speculative and indeterminate in amount cannot stand, in view of the undisputed evidence establishing a value of at least $163,250. This was not only the minimum value to the owner, but in all probability it represented a price actually realizable upon sale; i. e., buyers would probably be obtainable at these conservative capitalization figures, especially in view of the chance for increased return if more ore were discovered. Hoskold's Formula, which witnesses used, is a well-recognized means of determining market value for income tax purposes.

There is no reason why such a right, transferable, and having a high, fairly definite value, should not be regarded as property owned on March 1, 1913. It is regarded as property by business men and by the estate tax collector. Identification of property with things tangible is primitive legal psychology. See Commons, Legal Foundation of Capitalism, c. II. There is no question that a taxpayer can deduct from a 1919 payment the March 1, 1913, present value of his right to that payment, if on March 1, 1913, the right

was evidenced by a noninterest-bearing note. Ruth Iron Co. v. Commissioner (C. C. A.) 26 F.(2d) 30. And we have held similarly where taxpayer had on March 1, 1913, an insurance policy evidencing his rights to the future payment. Lucas v. Alexander (C. C. A. 6) 27 F.(2d) 237. It does not distinguish these cases in principle that the payments there were to be definite in amount, since in the present case payments were sure to be made, engineers could calculate with fair definiteness, what the payments would be, and Hoskold's Formula makes allowance for the chance of error. In Platt v. Bowers (D. C.) 13 F.(2d) 951, where taxpayer in 1909 acquired a contract right to 15 annual payments, it was held that the obligation owned on March 1, 1913, was property or capital, and that a 1919 payment was taxable only as to the excess over the March 1, 1913, present value of the rights to that payment. These cases are not inconsistent with Edwards v. Keith (C. C. A.) 231 F. 110, and Woods v. Lewellyn (C. C. A.) 252 F. 106. There no attempt was made to prove the 1913 present value of a contract right; the taxpayer urged that the post-1913 payments were pre-1913 income in toto merely because the services which they compensated had been performed before 1913. Holbrook v. Moore (D. C.) 293 F. 264, Jackson v. Smietanka (D. C.) 267 F. 932, and Zimbalist v. Anderson (D. C.) 23 F.(2d) 328, are obviously wide of the mark.

■ While the contract right owned on March 1, 1913, has never been sold, it has been partially converted into the annual payments whose capitalization it represents. This is so despite the fact that the diminished right in 1918 was more valuable than the full right in 1913, due to new ore discoveries. By the time the ore is all mined, or the mining leases end, whichever happens sooner (in all probability the first), the contract right will be extinct because completely satisfied. The aggregate annual payments therefore represent in part a return of capital, for which a deduction must be made. This is distinguishable in theory from a depreciation or depletion allowance, where property is worn out or used up in the manufacture or extraction of other property. Lynch v. Alworth-Stephens Co., 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660; Kaufman-Straus v. Lucas, 12 F.(2d) 774 (C. C. A. 6). It is a deduction of the March 1, 1913, value of the very property disposed of, since all the annual payments were summed up in the 1913 right to them, much the same as in the Ruth Case the future annual payments were embodied in

the notes. It does not unduly strain the statutory phrase to say that a contract right is "disposed of," when it is converted into cash by being satisfied according to its terms. The cases of Doyle v. Mitchell Bros., 247 U. S. 179, 38 S. Ct. 467, 62 L. Ed. 1054, Hays v. Gauley Mountain Coal Co., 247 U. S. 189, 38 S. Ct. 470, 62 L. Ed. 1061, U. S. v. Cleveland, C. C. & St. L. R., 247 U. S. 195, 38 S. Ct. 472, 62 L. Ed. 1064, and Lynch v. Turrish, 247 U. S. 221, 38 S. Ct. 537, 62 L. Ed. 1087, so strongly enunciate the general rule that only increases in value occurring after the basic date are taxable as to suggest doubts of the constitutionality of any interpretation of the Revenue Acts here applicable which does not exempt the March 1, 1913, value that had been in a sense created before that date by the ore discoveries a few months earlier.

■ It does not, however, follow, as appellants contend, that nothing is taxable until appellants have received payments to an aggregate amount exceeding the 1913 capital value. The statement that a taxpayer is entitled to return of capital means nothing more than that, by the time he has received all the money coming to him in a transaction, he must have been allowed to deduct his full capital; it does not necessarily mean that no tax is to be imposed until the entire capital shall have been received. There are no applicable statutory provisions or regulations. An analogy is in the taxation of annuities. In Warner v. Walsh (C. C. A.) 15 F.(2d) 367, followed in U. S. v. Bolster (C. C. A.) 26 F.(2d) 760, and Allen v. Brandeis (C. C. A.) 29 F.(2d) 363, it was held, under the Revenue Acts of 1916 and 1918, that the annual payments to one deemed to be the purchaser of an annuity are not taxable as income until the total installments received exceed the purchase price. The important question in these cases, however, was whether or not a widow, taking the testamentary annual payments in lieu of her statutory rights, was to be deemed the purchaser of an annuity. Holding in the affirmative, the court in the Warner Case accepted without argument or discussion the then prevailing departmental practice of nontaxability of annuities until the purchase price should have been returned in full.

This conclusion, not questioned in the briefs filed in behalf of the government and without citation or discussion therein of Klein v. Commissioner, 6 B. T. A. 617, decided after the Walsh Case and before the Bolster and Brandeis Cases, was naturally accepted and followed in those cases. In the Klein Case, the Board of Tax Appeals by majority

vote expressly rejected that part of the Walsh decision dealing with the way in which deductions were to be made, and held that so much of the first and each succeeding installment as represents the cost thereof at the time of purchase (or value at March 1, 1913, if purchased before that date) is to be deemed return of capital and free from income tax, while the remainder of each installment is to be taxable. The board in its opinion says: "The statutes provide neither that the first payments are all income nor that they are all return of cost; but they indicate rather that each payment is partly one and partly the other, and that the income part is all that it to be included in gross income. * * * The theory of apportionment is applicable to periodic payments just as it is to the ascertainment of gain in the sale of lots in a subdivided tract of land, of retail goods purchased in bulk, and other situations under the statute." This decision has been acquiesced in by the Bureau.

The rules as to installment sales are not in point, because they do not deal with the disposal of a right to annual payments, but with the sale of property, so that the amount deductible is the value of the property rather than the value of the right. Furthermore, the installment seller is not permitted to do what appellants seek here to do, even when he has elected not to file his returns under the installment plan, unless the purchase price installments have no ascertainable present value, unlike the case here.

In Ruth Iron Co. v. Commissioner (C. C. A.) 26 F.(2d) 30, the tax was held payable on so much of each noninterest-bearing note in a purchase-price series as the amount paid on any note exceeded the March 1, 1913, value of that note, based on 5 per cent. discount rate compounded annually. It is unnecessary in this case to determine whether the Klein decision or the Walsh Case should be followed in this circuit in the case of fixed annuities. The latter has the merit of simplicity; the former now sanctioned by departmental practice is probably the more accurate in its results.

█ In our judgment, the rule properly applicable in the circumstances of the instant case is that income tax is due upon so much of each annual payment as represents approximately a proportionate amount of the profit on the whole transaction, looked at from the standpoint of March 1, 1913. The first payments are clearly not wholly a return of cost. While for practical reasons, it may be desirable so to deal with them if there be a very high degree of uncertainty as to what, if any

minimum profit will result from the transaction, as in most cases of liquidating dividends, this is not true in respect to the case. On the other hand, the precise method of apportionment employed in the Klein and Ruth Cases is inapplicable here. In those cases, the percentage of profit was different for each installment, because the original capital value was calculated for each installment solely by the discount compounded annually; the difference between such capital value and the actual payment was the taxable profit.

In the instant case the witnesses as to 1913 capital value have relied upon Hoskold's Formula and obtained a single value of the whole series of annual payments; there is no determination of the March 1, 1913 value of each annual payment. Reference to compound discount tables is fruitless, since the Formula involves a theoretical sinking fund to take care of the risk element, in addition to a theoretical percentage of return in the nature of interest.

█ In our judgment, the fairest practicable method of deduction from annual receipts in order to insure return of capital, in view of the method adopted in finding March 1, 1913 value, is first to determine the ratio of that 1913 capital value to the aggregate of the face amounts of the estimated payments during the whole period, and then to deduct that proportion of each year's receipts until the entire 1913 capital value shall have been deducted. To illustrate with arbitrary figures: If the 1913 value were found to be $200,000, based upon an estimated 12,000,000 tons to be mined in 10 years, then as the total face amount of estimated receipts at 2½ cents per ton would be $300,000, the ratio of capital return to total receipts would be 2 to 3. If, then, in the first year the receipts are $37,500, because 1,500,000 tons were mined, two-thirds, or $25,000, would be deducted as capital return, and one-third, $12,500, would be the taxable profit or income. After the yearly deductions aggregated $200,000, all future payments would be profits, and as such fully taxable.

Based upon the experts' testimony, findings by the District Court are therefore essential as to tonnage and rate of mining, estimated as of March 1, 1913, and the then capital value of the contract. From these data the ratio of 1913 value to estimated total receipts will be readily determinable. The findings as to 1913 value will involve, under Hoskold's Formula, which witnesses used, a determination as of that same date of a fair rate of return, adopting, if the District Court under the evidence deems it best,

different rates for assured and for prospective ore, and a fair conservative rate of interest for the sinking fund calculation. The District Court will also determine the applicability, if any, of the parties' stipulation as to value per ton deductions for prorated return of capital, which are in the record without explanation, but are not embodied in the findings of fact.

In case No. 5211, the stipulated value of the contract right in 1918, at testator's death, will be the basis for further calculations, rather than the 1913 value. Section 213 (b) (3); 40 Stat. 1065, exempts "the value of property acquired by gift, bequest, devise, or descent" from gross income of the estate, as previously defined to include gains upon sales and dealings with the estate property. Even if Eldredge's will had not expressly bequeathed his contract right along with other residuary property to the executor trustees, we should hold that a disposition of property by executors is within the meaning of this section, both on a fair construction of the act and in view of the unusually clear legislative sanction of the early administrative interpretation to this effect. See Bankers' Trust Co. v. Bowers (D. C.) 23 F.(2d) 941 (1926 act); Appeal of Straight, 7 B. T. A. 177.

Reversed and remanded for further proceedings in accordance with this opinion.