## LOGAN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 214.

Circuit Court of Appeals, Second Circuit.

May 19, 1930.

Millard F. Tompkins, of New York City (John Enrietto, of Washington, D. C., and Herbert C. Smyth, of New York City, of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and J. Louis Monarch and John Vaughan Groner, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Allin H. Pierce, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

Prior to March 1, 1913, and until March 11, 1916, the petitioner owned 250 shares, and her mother 1,180 shares of the stock of the Andrews & Hitchcock Iron Company which had, as its capital structure, 4,000 shares of capital stock issued and outstanding. Andrews & Hitchcock Iron Company held a 12

per cent. stock interest in the Mahoning Ore & Steel Company. This latter company controlled, by a lease of 97 years from April, 1895, an iron ore mine—the Mahoning Mine—located on the Mesaba Range in Minnesota. It was an operating company, and mined the ore which it distributed only to its stockholders, who were steel manufacturers. The property consisted of 1,000 acres of mineral land, and it was estimated that it contained on October 11, 1916, 82,858,535 tons of ore.

On March 11, 1916, the Youngstown Sheet & Tube Company purchased all the outstanding capital stock of the Andrews & Hitchcock Company, thus acquiring the 12 per cent. stock interest of the ore mined by the Mahoning Company. In the purchase of this stock, it was paid $2,200,000 in cash and in addition it obtained a contract by which all the former stockholders were paid 60 cents per ton for each and every ton of iron ore which it might thereafter become entitled to receive from the Mahoning Company under the contract between it and the Mahoning Company. Payments were made annually, and all the transferred stock in the Mahoning Company was deposited as collateral security. Petitioner thus acquired a $^{250}/_{4000}$ interest in this contract for annual payments, and, when her mother died, she acquired, by bequest from her estate, an additional $^{550}/_{4000}$ interest in the contract.

Payments were made to the petitioner on account of this contract by reason of her interest therein, and respondent has held this was part capital return and part income as to the sums received in the years in question, 1918, 1919, and 1920. This resulted in the imposition of the tax which is here in dispute. In arriving at this result, the respondent determined that the total consideration received by the stockholders from the sale of their stock to the Youngstown Sheet & Tube Company on March 11, 1922, was $2,200,000 in cash and $1,942,111.46, the fair market value of the contract providing for payments as stated. And, in determining such fair market value, he estimated the total ore reserves in the Mahoning Mine to be 82,858,535 tons, the average annual production to be 1,841,300 tons, and the life of the mine to be 45 years, and the total future receipts from the contract to be $5,965,814.52. This result was reached by computing the present fair value, using the Haskold formula.

The respondent determined that the total of this consideration was more than the cost of the stock sold but less than its March 1, 1913, value, and he decided that no taxable income had been derived from the sale when made. However, with respect to annual payments from the contract, he determined that each payment should be regarded as part income and part capital return. He found the total amount of capital to be recovered was the fair market value of the contract at the time of its acquisition, and he divided each annual payment as between capital and income in the same proportions as the total capital to be recovered bore to the total anticipated receipts included in the gross income of each former stockholder the entire amount received by him during each year, and he allowed as a deduction therefrom the sum which he determined to be a capital return. As to this petitioner's interest, which she acquired from her mother's estate, he determined that the total amount of capital to be allowed was the fair market value of the interest at the time of the decedent's death and permitted capital to be recovered through apportionment of the annual payments as prescribed. He found the return each year to be 32½ per cent. capital return and 67½ per cent. income.

The Revenue Act of 1918, c. 18 (40 Stat. 1057), provides, in section 210, the normal tax upon the net income of every individual in the taxable year; section 211 in addition to the normal income, a surtax; section 212 defines net income as the gross income less deductions defined in sections 213, 214; section 213(a) considers gross income and includes "gains, profits, and income derived from * * * dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; * * * or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." And section 214(a) considers allowable deductions and provides:

"(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. * * *

"(10) In the case of mines, oil and gas wells, * * * a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted. * * *"

Section 202(a) provides:

"That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, person-

al, or mixed, the basis shall be—(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and (2) In the case of property acquired on or after that date, the cost thereof; * * * (b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any. * * * "

At the time Regulation 45, relative to the Revenue Act of 1918, was effective, and it provided that taxpayers be allowed a deduction in computing net income in cases of natural deposits, a reasonable allowance for depletion of mineral and other depreciations of improvements; that the fair market value of a property was that amount which induces a willing seller to sell and a willing buyer to purchase. Where there has been no sale and the fair market value at the basic date is to be used, such value will be determined by the method which the prospective buyer or seller in the industry would use in arriving at the sale value of the property at the basic date. And article 206 of the Regulation provides the method of determining the fair market value of mineral property. Article 210 provides the computation of deduction for depletion of mineral deposits, and by it (a) Depletion attaches to the annual production "according to the peculiar conditions of each case. * * * " (b) When the value of the property at the basic date has been determined, depletion for the taxable year shall be determined by dividing the value remaining for depletion by the number of units of mineral to which this value is applicable, and by multiplying the unit value for depletion, so determined, by the number of units sold within the taxable year. In the selection of a unit for depletion, preference shall be given to the principal or customary unit or units paid for in the product sold.

■ The valuation placed on the contract for the stockholder's benefit, giving them 60 cents a ton, in this case, together with cash paid in the sale, showed no gain over March 1, 1913, valuation, and there was no income tax payable in 1916. However, on the theory that there was a gain involved in the future obligations during the period of 45 years, the tax was imposed by determining, in the manner referred to, that each annual payment was part capital and part income. Income is declared and taxes imposed where cash is paid in a sale or where the thing received is capable of easy valuation in cash. Lynch v. Turrish (1918) 247 U. S. 221, 38 S. Ct. 537, 62 L. Ed. 1087; Safe Deposit & Trust Co. v. Miles (D. C. 1921) 273 F. 822. Where the consideration received is found to be the equivalent of cash, it may be valued, and, if a profit is realized, it will be taxed. Marr v. United States (1925) 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079. Before income can be derived, there must be not only some value to the consideration, but it must have an established or fair market value; it must be the equivalent of cash. Bedell v. Commissioner (C. C. A. 2, 1929) 30 F.(2d) 622; section 202(b), Revenue Act of 1918 (40 Stat. 1060).

■ There were many uncertainties involved in the future receipt of 60 cents a ton by this petitioner. She, a minority stockholder, was not in control. The right to continue to receive ore was dependent on the continuance in force of the contract of December 16, 1914, between the stockholders of the Mahoning Company. That contract might be abrogated or changed. No maximum or minimum payment is provided for by the contract. The tonnage mined each year was subject to the discretion of the board of directors of the Mahoning Company. The ore mined each year in the future might not come up to the production estimated as necessary to exhaust the mine in 45 years. In enforcing this taxing statute, a plain, obvious, and rational meaning is to be preferred. Lynch v. Alworth-Stephens Co. (1925) 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660. There was ample testimony satisfactorily establishing that there was no market for the sale of the obligation to pay the 60 cents per ton for 45 years, and it had no cash equivalent. Congress, by the phrase "fair market value" meant that, not only must the market price be ascertained by sales, but sales so made and the circumstances under which they were made were to be considered to determine whether such sales serve to evidence not alone a market sale, but the fair price which Congress said should be the satisfactory start or base from which subsequent gain derived should be determined. Walter v. Duffy (C. C. A. 3, 1923) 287 F. 41. It was the intention of Congress to provide a method of determining gain or loss when property is exchanged for other property and under the statute there is no taxable gain and no deductible loss unless the property received has a value realizable in money's worth. Tsivoglou v. United States (D. C. 1928) 27 F.(2d) 564; Heiner v. Crosby (C. C. A. 3d, 1928) 24 F.(2d) 191. And,

where the right to receive moneys is contingent as provided by a contract until the property right secured by the contract has been relieved of its element of risk and turned into cash, the income taxing act does not reach it, and the contingent right is not income. Woods v. Lewellyn (C. C. A. 3d, 1918) 252 F. 106. Cases like Kosmerl v. Commissioner (C. C. A. 7th, 1928) 25 F. (2d) 87, Ruth Iron Co. v. Commissioner (C. C. A. 8th, 1928) 26 F.(2d) 30, and Eldredge v. United States, 31 F.(2d) 924 (C. C. A. 6th), involved efforts to determine gain or loss on the sale of property and the determination of its March 1, 1913, valuation. They did not involve a question, as here, of whether a promise to pay in the future a sum of money in consideration of the transfer of stock has a present market value for determination of gain before the promise is fulfilled. The question in those cases was one of ascertaining the value of the rights as of March 1, 1913, to future annual payments, which value the taxing statute requires should be returned before any part of the latter conversion into cash could be considered as income. The necessity of this determination arises only after there has been a gain derived, and the March 1, 1913, valuation is necessary to apportion that gain between the gain accrued prior to and that accrued subsequent to March 1, 1913. Lucas v. Alexander (1929) 279 U. S. 573, 49 S. Ct. 426, 73 L. Ed. 851, 61 A. L. R. 906. Here we have the question of whether there was any gain.

 The estimate of recoverable tonnage of ore is very much in dispute; likewise the annual production and period of years estimated to complete the mining. Indeed, witnesses familiar with the mine and its operation and interested therein and qualified to speak gave testimony that the promise to make future payments had no ascertainable market value. As stated by a learned author, in the practical conduct of mines or mining, sinking funds for amortization of capital are never established. The ultimate duration of the life of a mine is uncertain or unknown and forms no basis on which to formulate a definite financial policy. Hoover's Principles of Mining, p. 44. See also Pacific Gas Co. v. San Francisco (1924) 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075. Moreover, the division of percentage as a return of capital and that of income is an estimate based upon assumptions and uncertainties. It is an unsafe guide either to determine exchangeable value or the fair market value. O'Meara v. Commissioner (C. C. A. 10th, 1929) 34 F.(2d) 390.

 It is necessary that the future payments made to the stockholders of the Andrews & Hitchcock Company amount to $1,942,111.46 before the petitioner will have a full return of her capital. Until the petitioner receives her full share of this capital return—the exchangeable or fair market value in 1916—she will receive no income, but a return of her capital as deferred payments. There will be no gain or loss realized in the 1916 transaction until this sum is returned to her. As to the shares inherited from her mother's estate, the value of the capital return will be the value of such interest at the time of her mother's death.

 The respondent's determination deprived the petitioner of the benefit of that part of the March 1, 1913, value which is greater than the consideration received, to the extent to which the March 1, 1913 value exceeded $2,200,000 plus the present value estimate of the promise to pay as $1,942,101.46. When he ascertained the gain from the subsequent conversion or the disposition of the contract right to receive future payments, he did not give credit to the taxpayer for any March 1, 1913 value, but began the base anew on the theory that the contract right to receive payments when reduced to cash is partly a return of contract right and partly income. In Doyle v. Mitchell Bros. Co. (1918) 247 U. S. 179, at page 185, 38 S. Ct. 467, 469, 62 L. Ed. 1054, the court said: "In order to determine whether there has been gain or loss, and the amount of the gain if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration." See, also, Goodrich v. Edwards (1921) 255 U. S. 527, 41 S. Ct. 390, 65 L. Ed. 758; Mastin v. Commissioner, 28 F.(2d) 748 (C. C. A. 8th); United States v. Guinzburg (C. C. A. 2d, 1921) 278 F. 363. The Commissioner may not create income by spelling out paper profits with all the attending uncertainties which exist here and which might prevent the return of capital. The statute and the regulation referring to depletion of the mines, we think, have no application to this petitioner.

 In his calculations, the respondent, being guided by the Haskold formula, has in effect determined that the contract of March 11, 1916, by which the stockholders of the Andrews & Hitchcock Company received these benefits constitutes a right to annual payments fixed by accepting the tonnage thought to be in the mine, the annual mining operations, the length of time necessary for ex-

haustion, and the price paid for the ore mined, and this amounted to $132,573.60 annually to be paid to the vendors of the stock. If all went well each year, and the mining operation was the same with the same degree of fortune as to the quantity and quality of the ore mined, there would be insured to the stockholders this annual payment. In effect it would be similar to an annuity. Therefore, when this taxpayer sold her stock, in addition to receiving cash, she would obtain what substantially amounts to an annuity for a period of 45 years. If this were a purchase of an annuity, the sums received in the years in question could not be taxed as income. Warner v. Walsh (C. C. A. 2, 1926) 15 F.(2d) 367. The same principle is applicable. United States v. Bolster (C. C. A. 1, 1928) 26 F.(2d) 760, 59 A. L. R. 491; Allen v. Brandeis (C. C. A. 8, 1928) 29 F.(2d) 363.

There is no taxable income received until there has been a return of petitioner's capital, ascertained by finding her proportionate share of the value of her original 250 shares as of March 1, 1913, and as to those shares inherited from her mother's estate, the value of such interest at the time of her mother's death.

Order reversed.