Recovery of the taxes paid on the tobacco shipped in the Stephano case and lost in a railroad wreck was allowed under a provision applicable alone to tobacco, and not to liquor, which permits the redemption of stamps on "tobacco, snuff, cigars, or cigarettes which, after removal from factory or customhouse for consumption or sale, the manufacturer or importer withdraws from the market." We held that the cigarettes lost in this wreck had been withdrawn from the market within the meaning of this statute, 26 U.S.C. § 2198; but, as stated, this statute has no application whatever to distilled spirits.

 The provisions of the Internal Revenue Code applicable to tobacco have no application to liquor, and the provisions applicable to liquor have no application to tobacco. They have no relation one to another, no analogy, no affinity, no consanguinity; they are not on speaking terms.

The Government raises other defenses to plaintiffs' claim, but we do not discuss them because we are so clearly of the opinion that plaintiffs are not entitled to recover on the merits, irrespective of the statute of limitations. We know of no special considerations which would justify making an allowance to plaintiffs not enjoyed by others in a similar situation.

 We are of opinion that the National Distillers Products Corporation has neither a legal nor an equitable claim against the United States, and, *a fortiori*, the Erie Railroad Company and the Atlantic Mutual Insurance Company have neither a legal nor an equitable claim against the United States.

This opinion, together with the findings of fact, will be certified to the Congress pursuant to House Resolution 402 of the 84th Congress, 2d Session.

It is so ordered.

JONES, Chief Judge, GEORGE THOMAS WASHINGTON, Circuit Judge, sitting by designation, and MADDEN and LITTLETON, Judges, concur.

**QUINCY MINING COMPANY**

v.

**UNITED STATES.**

No. 467–53.

United States Court of Claims.

Dec. 4, 1957.

Montgomery B. Angell, New York City, Wallace S. Jones, and Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, on the brief, for plaintiff.

John A. Rees, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland, Washington, D. C., on the brief, for defendant.

MADDEN, Judge.

The plaintiff sues to recover income taxes collected from it for the year 1947. Its liability for the taxes depends upon its right to deduct from its gross sales for that year and the year 1948 certain expenses incurred by its predecessor during the years 1919, 1920, and 1921. Those expenses bore a relation, which will appear hereinafter, to its gross sales in 1947. The year 1948 is involved only because of a claimed carryback of losses from that year to 1947.

The plaintiff succeeded, in 1932, to another corporation of the same name. The fact that there was such a succession has no significance in this case, and both corporations will be designated herein, indiscriminately, as the plaintiff.

The plaintiff began, prior to 1900, the business of mining copper ore, stamping and grinding it, extracting copper concentrate from the ore, smelting these concentrates to produce copper, and selling the copper in the market. After the copper concentrates had been removed from the ground ore, the remaining ore was known as sands. Although the sands were known to contain a considerable amount of copper, it was not profitable, with the equipment and methods then used by the plaintiff, to extract any of the copper remaining in the sands.

The milling and extracting operations of the plaintiff were located on the shore of Torch Lake, in Michigan. The sands were deposited in piles in the lake, at points where the plaintiff owned the bed of the lake. The placing of the sands under water minimized the oxidation of the copper which was left in the sands.

As early as 1919 the plaintiff's officers believed that a process would be developed which would make it commercially feasible to recover at least a part of the copper in these sands. Another company dealing with a somewhat different type of copper was doing so. From 1929 on the plaintiff was able, in its initial processing of ore, to recover a substantial part of the copper which it had formerly had to leave in the sands, but it had still developed no method of recovering the copper in the sands previously deposited. In 1943 the plaintiff constructed a plant which was able to recover a substantial part of the copper from sands taken from the old piles.

During the years 1920, 1921, 1923, 1926, and 1927, the plaintiff's mining, milling, smelting, and delivery costs, including the costs of disposing of the sands described above exceeded the amounts which it received from the sales of the copper produced. In its books of account it charged all of these costs as costs of the copper then sold. The accounting thus showed an operating loss, and in the plaintiff's tax returns for those years no profit and no taxable income was shown. The amounts by which the plaintiff's costs in those years exceeded its receipts from the sales of copper did not reduce its income tax, since it would have had no tax to pay even if there had been no excess of costs over receipts, but an even balance between the two figures. For reasons which need not be elaborated here, the plaintiff received no tax benefit from the losses described above, by way of carry-back or carry-forward or otherwise.

As we have said, the plaintiff began in 1943 to reprocess the sands which it had deposited in the lake many years before. Copper was necessary for the war and the Government's Metals Reserve Company loaned the plaintiff money to build a plant to process the sands,

and contracted to buy the copper produced, at a price of five cents a pound above the OPA ceiling. The plaintiff was also granted the privilege of accelerated amortization of its plant, the period being set at five years. The plaintiff repaid its loan to Metals Reserve in less than four years, and continued to operate the plant.

The sands processed in the years 1947 and 1948 contained about six and one-half pounds of copper per ton of sands. An average of more than four pounds of copper per ton was recovered, a total recovery of 1,242,129 pounds in 1947 and of 2,932,251 pounds in 1948.

In its tax return for 1948, and in a claim for refund later filed and relating to its 1947 return, the plaintiff set up as costs of production of the copper sold in those years part of the original mining and milling costs incurred in the years 1919, 1920, and 1921 when the sands were deposited in the lake. The parties have stipulated that the sands reprocessed in 1947 and 1948 were deposited in the water in 1920 and 1921, which were years in which the plaintiff's costs exceeded its receipts from copper sold. The parties have stipulated a rational apportionment of the plaintiff's excess and unused costs in 1920 to the copper produced from the sands and sold by it in 1947. As to such an apportionment for 1948, the parties have left that for future determination.

The parties have stipulated that it has been the practice in the mining industry to charge all the costs of the original mining, milling and smelting of ore as costs of the metal produced by this first processing, and sold. This practice is advantageous to the ordinary enterprise which operates at a profit, since it holds down the taxable profit below what it would be if a part of the costs were attributed to a semi-processed product of the operation, which would result in nothing saleable until some future time. When this practice is followed, and all of the costs are used up, for tax purposes, against the selling price of the primary product, any future recovery from the residue cannot, of course, be charged with any of the costs formerly incurred.

The plaintiff, in its accounting in the years when the costs here in question were incurred, followed the usual accounting practice and, as we have said, recorded an operating loss, attributing no inventory value to the sands. Now that the sands have turned out to have an ascertainable inventory value, should the taxpayer be allowed, by a rational method of apportionment, to attribute a part of the prior-incurred costs to these sands?

The plaintiff says that the Constitutional permission to tax income does not authorize the Government to tax gross receipts in disregard of the costs of producing the goods which were sold for those receipts. It says that, since it did not, in 1920, get back or get tax credit for all of the costs of what it sold then, and in 1947, the 1947 taxes were, *pro tanto*, an unconstitutional tax upon gross receipts.

The Government would treat what took place in 1920 as a closed incident; would treat the sands then deposited as discards; and would say that when they were picked up in 1947 and processed, that operation had no relation to the events of 1920. It appears from the stipulation of the parties that the sands were not regarded by the plaintiff as worthless discards when they were deposited in the lake. The plaintiff's ideas at that time as to when and how, if ever, they might be profitably further processed were, no doubt, vague. The market price and the progress of science would resolve those questions.

We are by no means certain that the question before us is so fundamental as to involve the Constitution. But we think that the plaintiff's earlier accounting practice does not determine its rights. The Supreme Court said in Doyle v. Mitchell Brothers Co., 247 U. S. 179, 187, 38 S.Ct. 467, 470, 62 L.Ed. 1054:

"Nor is the result altered by the mere fact that the increment of value had not been entered upon plaintiff's books of account. Such books are no more than evidential, being neither indispensable nor conclusive." ·

We have, then, a case where the plaintiff in 1947 gets money for selling copper recovered from sands produced by a mining, stamping, grinding and milling process in 1920. The money which it received in 1947 was, in part, attributable to the expense which had been incurred in 1920. Some of that expense had never had any tax consequences, since, even without it, there was no income to tax. We think it was, in fact, a part of the cost of the copper sold in 1947 and that the Government has presented no valid reason why it should not be so treated for income tax purposes.

The plaintiff is entitled to recover, and judgment is entered to that effect.

The case is remanded to a commissioner of this court for further proceedings pursuant to Rule 38(c), 28 U. S.C.A.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

The majority opinion is in conflict with a fundamental principle of the income tax law, that of computing income on an annual basis. It would apply against the income of the taxable year costs incurred a quarter of a century earlier.

All these costs were deducted from the income of prior years. This was in accord with standard practice and was proper. That plaintiff acquired no tax benefit therefrom is no reason for allowing it to deduct these costs in a year when it would give it a tax benefit.

If the plaintiff in the years 1919, 1920 and 1921 had charged a part of its costs to the cost of producing these sands, and had carried the sands in its inventory, it would have been able to deduct these costs from the sales price of the sands; but this it did not do. It thought the sands were of no value and dumped them in the water of the lake. When later it discovered that the sands had some value, it is not entitled to go back and eliminate some of the costs incurred, in 1919, from its income of that year, and bring them over into the year 1947, a year in which the costs were not actually incurred.

Plaintiff properly computed its income in 1919, 1920 and 1921. All companies which realized a profit in those years likewise computed their income. The fact that plaintiff happened to sustain a loss in those years is no reason for allowing it to eliminate those costs in computing its income in 1919, 1920, and 1921, and now bring them forward to the year 1947, in which it realized a profit.

Once having deducted these costs, back in 1919, 1920 and 1921, plaintiff is bound thereby and cannot now deduct them again in 1947. The fact that it realized no tax benefit in 1919, 1920 and 1921 is immaterial.

FAHY, Circuit Judge, sitting by designation, joins in the foregoing dissenting opinion.

NATIONAL BISCUIT COMPANY
v.
UNITED STATES.
No. 49752.

United States Court of Claims.
Dec. 4, 1957.

