## PEABODY COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4515.

Circuit Court of Appeals, Seventh Circuit.
Dec. 30, 1931.

Rehearing Denied Feb. 18, 1932.

Albert L. Hopkins, J. C. Halls, and Thos. P. Dudley, Jr., all of Chicago, Ill., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and John H. McEvers and Sewall Key, Sp. Assts. to Atty. Gen., and E. C. Crouter, of Washington, D. C. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Frank M. Thompson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Petitioner complains of the redetermination of its federal income taxes for 1921, fixing its deficiency at $122,091.77. The controversy is over petitioner's undertaking to deduct from gross income the sum of $400,000 as a loss accrued in the taxable year under section 234 (a) (4) of the Revenue Act of 1921 [1] (42 Stat. 227, 254), or as a debt ascertained to be worthless, and written off to the extent of $350,000 during the taxable year, under section 234 (a) (5).[1] The same facts apply to both propositions, save that under (5) only $350,000 could be deducted, as the debt was, during the taxable year, charged or written down to $50,000.

The alleged loss arises through petitioner's relation with Black Mountain Corporation, in which petitioner and two other coal corporations held, in equal shares, 51 per cent. of its outstanding stock. Black Mountain had acquired 32,000 acres of coal lands in Kentucky and Virginia, part of which was being operated by other coal concerns upon a royalty basis. In 1917 it decided it would itself develop and operate some of its undeveloped mining lands. It then funded its existing indebtedness by the issuance of bonds, called Empire Trust Company bonds, to the extent of $2,326,000, secured by a first mortgage on the Virginia land and a second mortgage on the Kentucky land.

The estimated cost of the development was $1,000,000, and to meet this a 6 per cent. bond issue of $1,250,000, called Central Trust mortgage bonds, due serially 1924 to 1934, was sold to the public at 90 cents. This issue was secured by a first mortgage on the Kentucky land and a second mortgage on the Virginia land.

Petitioner and the two corporations associated with it in the ownership of the majority of Black Mountain's outstanding stock each contracted with Black Mountain to purchase, in equal shares, its entire output of coal up to a million tons per year, for a period of twenty years, and to pay Black Mountain therefor the cost of production of the coal (whereof the items were enumerated, including interest and the annual sinking fund payments under the Central Trust mortgage), plus 10 per cent. of such cost. It was specified that any of the three, upon giving a stipulated notice, should be relieved from the obligation to purchase, but in such case any one so relieved would nevertheless be required to pay annually to the trustees of the Central Trust bonds one-third of the interest and one-third of the sinking fund requirements as specified in the mortgage.

Owing to high prices and scarcity of material and labor in those years, the development proceeded far more slowly and at much greater cost than was anticipated, and from time to time petitioner and its associates ad-

---

[1] "Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise; unless, in order to clearly reflect the income, the loss should in the opinion of the Commissioner be accounted for as of a different period. * * *

"(5) Debts ascertained to be worthless and charged off within the taxable year (or in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part; * * *"

vanced to Black Mountain money therefor, each to the extent of about $400,000. It was to reimburse petitioner for this advance that, under date of November 15, 1920, the bonds in question, known as general mortgage bonds, were issued, and in May, 1921, delivered to petitioner in the amount of $500,000 in payment for its advances.

In the fall of the same year petitioner appointed a committee to make examination of the Black Mountain properties and affairs to ascertain the value of the bonds it had so received. It does not appear that the committee made a report, but it was testified that, as the result of its investigation, the board of directors concluded that the bonds were valueless, and late in December, 1921, the bonds were written off on the books as a loss except as to $50,000 thereof. Witnesses for petitioner testified that the value of all Black Mountain assets was less than the prior lien bond issues.

The facts are more fully stated in the findings of the Board of Tax Appeals, reported in 18 B. T. A. 1081. One of its findings is that the value of the land and mining equipment of the Black Mountain Corporation in 1921 was about $2,870,000, which is somewhat less than the outstanding superior liens of the Empire Trust and Central Trust bonds.

It is apparent that the contracts of Black Mountain with petitioner and its corporate associates were of considerable prospective value to Black Mountain. The guaranty of cost, plus 10 per cent. on coal which it produced and sold to petitioner and associates, was an assurance of profit from these contracts, especially as one cost item was the interest and annual sinking fund under the Central Trust mortgage, the contracts having been assigned to Central Trust as additional security. Even in case petitioner or its associates declined to take the coal, there was still their obligation to pay the Central Trust sinking fund, which would gradually reduce the Central Trust principal, as well as to pay the interest. In a computation for such a purpose, Central Trust bonds could scarcely be deemed a Black Mountain liability for anywhere near their face value.

It is true the Black Mountain coal production did not begin until 1919, and for some years did not nearly approximate the million ton mark. It was about 300,000 tons for the year 1921. But Black Mountain was not then in liquidation. It was then, and ever since has been, a going concern. At times since 1921 production has run as high as 900,000 tons a year.

Petitioner received the $500,000 of bonds in about May, 1921, in payment of $400,000 of advances made, and it is at least singular that so shortly thereafter as December of the same year petitioner should find its bonds valueless, and write them off as it did. Without at all impugning petitioner's good faith, it seems apparent to us that in the usual course of business, uninfluenced by an extraordinarily high tax rate for 1921, these bonds would not then have been deemed a loss nor have then been written off.

The case is not like United States v. White Dental Mfg. Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120, where the property in Germany of a German corporation, subsidiary of the White Company, was seized during the World War by the German government as alien property. This was a definite, certain occurrence which to all intents and purposes then removed the property from any possession or control of the parent company, causing the latter a definite loss, held to be deductible during that year. The court held it was proper to write it off quite regardless of the fact that in a subsequent year a substantial part of the property or its avails was recovered. That is not the case here, where the business of Black Mountain Corporation has been continuously carried on, and where there has been no specific occurrence—such, for example, as loss by flood or fire, or a seizure—which extinguished or materially lessened the actual property on which the bonds in question were secured.

It is to be noted that during the times in question Black Mountain carried its property on its books at near $8,000,000, and that petitioner and its corporate associates were in actual or potential control of the corporation.

While what has been said sufficiently indicates why we coincide with the Board's conclusion that in 1921 the bonds were not wholly or in part worthless within the meaning of the Revenue Act of 1921, we nevertheless refer to, without deciding, a further proposition put forth for respondent, viz., that, upon the showing made, Black Mountain debts, with the issuance of the general mortgage bonds, exceeded its capital stock, and that in such case Black Mountain directors who assented to such excess of indebtedness became liable therefor. In a proper case there would be such a liability under chapter 32, par. 23, Cahill Rev. St. 1925 Ill. While our search of the record fails to disclose where Black Mountain was incorporated, yet the burden of proof in such controversies is in general upon the taxpayer; and, in the ab-

sence of any proof to the contrary, may it not be assumed that Black Mountain was a corporation of the state wherein this suit is pending?

Neither does the record disclose the personnel of the Black Mountain directorate, nor which of the directors assented to the creation of indebtedness beyond its capital stock; nor does it disclose the financial responsibility of any such assenting directors as bearing upon the collectibility and, inferentially, the value of the bonds in question. But, in the absence of all proof thereon, may it not be concluded that, with such potential liability of directors outstanding, petitioner has not sustained its burden of affirmatively showing that in the year 1921 the bonds were wholly or partly valueless?

The judgment of the Board of Tax Appeals is affirmed.