THE CREAMETTE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85415. Promulgated January 28, 1938.

*Charles H. Preston, Esq.*, for the petitioner.
*Gerald W. Brooks, Esq.*, for the respondent.

#### OPINION.

KERN: This case comes before us on respondent's determination of a deficiency of $2,778.96 in petitioner's taxes for the calendar year 1933, apportioned as follows: Income taxes, $2,552.40; excess profits taxes, $226.56.

Two questions were raised on the petition, but since one was stipulated by the parties, only one remains, whether respondent was correct in including in petitioner's income for 1933 the balance of a reserve which had been set up under a scheme, instituted by petitioner in 1926 but abandoned in 1933, to advertise and thereby increase the sale of its product, macaroni, by issuing premium coupons redeemable in certain selected articles of merchandise. The cost of issuing the coupons and of the merchandise used as premiums in their redemption are concededly deductible expenses incurred in carrying on the business, and the reserve set up under the Treasury regulations by the petitioner, which used the accrual basis of accounting, was a proper way of anticipating such expenditures. No question is raised on this. The applicable Treasury regulation we shall examine hereinafter. The deductions in respect of the reserve were claimed by the petitioner in each year and were allowed by

the respondent. But the petitioner, during the years from 1926 to 1929, inclusive, accumulated in its reserve $10,000 in excess of the amount actually necessary to meet such expenditures for redemptions. This sum was included in the deductions allowed. Petitioner abandoned the whole scheme of premiums in 1933, and thereupon transferred this sum in that year from its premium reserve account to its surplus account. Respondent now contends that this amount, which was returned by the petitioner but in consequence of the deduction allowed never treated as taxable income, constitutes income realized and taxable to the petitioner in 1933. In addition to the $10,000 in question, $1,539.45 also remained in petitioner's reserve account at the end of 1933, but admittedly this sum was necessary to meet the redemption of outstanding coupons issued in that and prior years, and by September 1935 all but $190 of it had been so expended. No question is made of this balance, therefore, and we need concern ourselves only with the $10,000 reserve balance which was transferred by petitioner in 1933 from its reserve account to its surplus account.

Petitioner maintains that it complied with the Treasury regulations and acted in good faith in claiming the deductions in respect of the reserve which were allowed in the several prior years and that the respondent not having called for amended returns for the prior years, is therefore foreclosed from raising any question as to those years. The respondent contends that the abandonment of the premium scheme in 1933 was the occasion of the realization of income by petitioner in that year in respect of any balance then in the reserve which was then unused and unlikely to be used, as the $10,000 admittedly was. Certain analogies with other kinds of reserves are drawn, which we shall examine.

This is the gist of the facts and of the contentions raised. The facts stipulated in detail by the parties are incorporated here by reference.

The petitioner relies on Treasury Regulations 77, article 335, which is identical with the regulations applicable under the prior acts involved, Regulations 74, article 335; Regulations 69, article 91; and is as follows:

ART. 335. *Subtraction for redemption of trading stamps.*—Where a taxpayer, for the purpose of promoting his business, issues with sales trading stamps or premium coupons redeemable in merchandise or cash, he should in computing the income from such sales subtract only the amount which will be required for the redemption of such part of the total issue of trading stamps or premium coupons issued during the taxable year as will eventually be presented for redemption. This amount will be determined in the light of the experience of the taxpayer in his particular business and of other users of trading stamps or premium coupons engaged in similar businesses. The taxpayer shall file for

each of the five preceding years, or such number of these years as stamps or coupons have been issued by him, a statement showing—

(a) The total issue of stamps during each year;

(b) The total stamps redeemed in each year; and

(c) The percentage for each year of the stamps redeemed to the stamps issued in such year.

A similar statement shall also be presented showing the experience of other users of stamps or coupons whose experience is relied upon by the taxpayer to determine the amount to be substracted from the proceeds of sales. The Commissioner will examine the basis used in each return, and in any case in which the amount subtracted in respect of such stamps or coupons is found to be excessive an amended return or amended returns will be required.

The petitioner put one coupon in each carton of its products. The carton was apparently not the primary container of the macaroni which went to the consumer, but was a secondary container which went only to the retail dealer, for whom the coupon was intended. The offer on the coupon bore a limitation date, usually some months after the calendar year of issuance, but sometimes after the expiration of the offer date petitioner would redeem coupons presented to keep trade good will. The petitioner estimated the cost of redemption of each coupon, that is, the cost of the merchandise offered as premiums, at 6 cents; and in its first year of coupon issuance, 1926, it estimated that 80 percent of the coupons would be redeemed, and set up its reserves for that year accordingly. The discrepancy between this estimate and the reality was great, for in that year the redemption value of coupons actually redeemed was only $882 as against a reserve of 80 percent amounting to $6,610.42. This reserve was claimed as a selling expense by petitioner in its return for that year. Admittedly petitioner was without experience in estimating such reserves, and the respondent did not, in this instance, as the regulation provides, "examine the basis used in each return", and where "the amount subtracted in respect of such * * * coupons is found to be excessive" require an amended return. But the initial burden of showing the experience of other users of coupons is thrown by the regulation on the taxpayer, and this burden was not met, the taxpayer never giving to respondent either a statement of its own experience or the experience of other users of stamps or coupons. In short, neither the taxpayer nor the Commissioner did what should have been done under the regulations in 1926 to prevent the distortion of income which would necessarily result from an excessive deduction.

The story of the succeeding years is similar. Again, in 1927, petitioner set up a reserve of 80 percent of issued coupons, $10,619.61, and redeemed to the amount of $4,389, or about 30 percent. The Commissioner did not require any amended return. The petitioner continued to use the same ratio of 80 percent through 1929, in each

year accumulating a greater reserve, until at the end of that year it was $23,637.84. Up to then the taxpayer had made no use of comparatives or even of its own experience in reserves, and the Commissioner had made no requests for such information, although the reserve appeared each year in the return as a part of the selling expense. In that year the coupons redeemed were about 50 percent of those issued. Finally, in 1930 petitioner, at length realizing that 80 percent was much too high, dropped to 40 percent, and for the first time found the coupons redeemed very slightly in excess of the annual reserve set aside; and on the same ratio next year found the annual addition to the reserve substantially exceeded. In 1932, on a ratio of 20 percent, the redemption far exceeded that year's reserve, and petitioner continued, as in the previous year, to draw on the excess reserve accumulated over prior years. No annual reserve was set up in 1933, the coupon premium scheme was abandoned in that year, and the $10,000 accumulated balance was transferred, as said, to surplus at the end of the year. Not until March 16, 1936, when the statute of limitations barred any correction by amended return of the excessive reserves taken as deductions by petitioner from 1926 to 1929, inclusive, did the Commissioner raise any question, but on that day he determined the present deficiency in petitioner's income tax for 1933.

We have passed upon the regulation set out above, *Houghton & Dutton Co.*, 26 B. T. A. 52, 58; and have denied its application only where the taxpayer claimed the full amount of trading stamps issued, without regard to the probability that only a portion would be redeemed, where no attempt had been made by the taxpayer to comply with the regulation, and where, moreover, the taxpayer had already deducted the full cost of premium merchandise through its inventories. Cf. *O. J. Morrison Department Store Co.*, 23 B. T. A. 895. In the instant case petitioner made an effort to comply with the regulation by reducing its annual reserve deduction, after four years' experience had shown the earlier deductions excessive, but neither petitioner nor respondent adhered strictly to the regulation. No question is made, however, of petitioner's good faith in claiming the earlier deductions.

The substance of respondent's contention is that petitioner, having deducted and been allowed this amount of $10,000 from its income in anticipation of a contingent expenditure which it has not been called upon to meet and which now, since its abandonment of the coupon policy, it will certainly never have to meet, has in respect of this amount realized income in the year when the contingency determined. This argument necessarily disregards the regulation, since amended returns are now impossible. The petitioner, having hitherto disregarded the regulation, now invokes its aid and contends that, the

deductions allowed under it having become absolute by the statute of limitations, the excess of such deductions is not questionable now.

In *G. M. Standifer Construction Corporation*, 30 B. T. A. 184, we considered the question of a reserve set up to meet litigation. We said:

* * * This item was in substance a reserve, and, if allowable as a deduction at the time set up, the balance remaining in it after settlement of the claim which prompted its creation was income in the year of settlement, 1924. Unexpended balances in reserve accounts are income "in the year in which the reason for which they were created ceased to exist." *Peabody Coal Co.*, 18 B. T. A. 1081. We further held in the *Peabody Coal Co.* case that reserves of a kind that are not recognized as constituting allowable deductions should be restored to income in the year in which they were set up. Consequently, whether the vouchers payable account was a correct account or an erroneous account, the amount remaining unexpended at the close of 1924 was income in that or a prior year rather than the year 1927 as held by the respondent.

And we went on to state the general theory of restoring reserve balances as follows:

* * * The theory underlying the restoration of reserve balances to income, like that of recoveries on losses for prior years (*Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359) and collections on debts previously deducted as worthless (*Askin & Marine Co.*, 26 B. T. A. 409; affd., 66 Fed. (2d) 776), is that by taking the deductions in the earlier years the taxpayer benefited through a reduction of its taxable income, and subsequent events demonstrate that there was in fact no loss, even though honest belief so indicated at the time. * * *

A pertinent paragraph in our decision in *Peabody Coal Co.*, 18 B. T. A. 1081, 1091; affd., 55 Fed. (2d) 7 (C. C. A., 7th Cir.); certiorari denied, 287 U. S. 605, cited, *supra*, is relied on here by both parties. It is this:

We are also of the opinion that the respondent erred in including in the petitioner's income for 1921 the amounts remaining in the reserve for subsidence and the reserve for excessive freight. These reserves were set up by the petitioner in the years 1919 and 1920 and no change was made in them in the year 1921. If they were not reserves of the kind that are recognized as proper deductions from income by the several revenue acts, they should have been restored to the petitioner's income in the years in which they were made. If they are reserves the net additions to which are allowable as deductions from income, then the unexpended balances became income to the petitioner in the year in which the reason for which they were created ceased to exist, which was in 1922. The amount of the reserves in question should be eliminated from the petitioner's income for 1921.

We think that respondent's construction of this paragraph is right, and that the reserves here set up were "of the kind that are recognized as proper deductions from income by the several revenue acts", since express provision is made for such deduction; that is to say, that they were the *kind* of reserve which is deductible in full and not the kind which is properly deductible only to the extent of actual expenditures from them.

The rule to be drawn from these cases appears clearly to be that amounts set up by a taxpayer on his own responsibility and without authority granted by statute or regulation in order to meet a contingent liability, being set up out of income received in a particular year, are, if the liability is not realized in that year, to be "restored to income in the year in which they were set up." *G. M. Standifer Construction Corporation, supra,* at page 187. Such reserves may not be deducted in anticipation of the realization of the liability, and the failure to realize the liability in any particular year restores immediately to the income of that year the amount withheld from income for the purpose in that year. But reserves set up and added to year by year, which may be deducted by authority of statute or regulation, are obviously in a different category. Statutory permission to deduct presently a reserve in anticipation of a contingent liability does not contemplate, however, an absolute deduction beyond the possibility of correction should the liability never be realized. It likewise is subject to adjustment on the whole balance of reserve against loss or expense. We do not understand petitioner to deny this. But since the deduction is absolute for the particular year in which it is allowed, the unexpended balance of the reserve is not restored to income by its redistribution through the past years in which the income was realized but is treated as new income realized in the year in which the extent of the liability is finally determined. Cf. *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359; *Commissioner* v. *Liberty Bank & Trust Co.,* 59 Fed. (2d) 320.

Assuming then that the unexpended balance in the reserve would constitute income when the liability ceased, the only questions remaining are whether the year 1933, in which the petitioner ceased to issue premium coupons and therefore had no further use for a reserve, was the year in which it realized income in respect of the $10,000 balance; and if so, whether the Commissioner's regulation prevents the application in this instance of this established rule.

We think the first question should be answered in the affirmative. In 1933 the possibility of liability on the coupons ceased, for the petitioner's last coupon premium offer was expressly void after December 31, 1933; and a further amount of $1,539.45 was still left in the reserve account, which should have been sufficient, on all of petitioner's experience, as it actually proved to be in fact, to meet coupon premium redemptions which the petitioner might deem it advisable to make after December 31, 1933, for the purpose of preserving the good will of its retail dealers. Moreover, the transfer of the amount of $10,000 on the petitioner's books is, in itself, a tacit admission of this fact and, in all the circumstances, can not be gainsaid.

But does the express regulation of the Commissioner preclude him from treating this unexpended balance as income in 1933? On this point the petitioner strenuously insists, and cites *Fall River Electric Light Co.*, 23 B. T. A. 168, in which we upheld the Commissioner's practice under a long established regulation to treat the amount of a premium received by the taxpayer on the sale of its bonds as income received annually pro rata through the term of the bonds, as against the practice followed by the taxpayer and prescribed by the Massachusetts public utility department for utility companies doing business like the taxpayer in that state, of treating such a premium as income the realization of which was deferred to maturity of the bonds. Petitioner insists that the regulation here should likewise be adhered to.

The regulation prescribes a method which will, if adopted, most clearly reflect income without undue distortion because of allowed deductions which can not be fully determined in advance. It therefore provides for amended returns which will lessen any distortion which a later experience of the taxpayer has shown to exist. It requires the taxpayer in the first place to furnish evidence of the reasonableness of the reserve set up and of the additions to it. Here the petitioner neither furnished such data, which may not have been available to it in the earlier years, nor amended its returns for later years, after its experience had taught it the unreasonableness of its earlier claims. Nor did the respondent require any amendments of the petitioner's returns. The earlier deductions which resulted in reduction of petitioner's taxable income in the years 1926 to 1929, inclusive, were allowed, and now that the statute of limitations has run, are beyond recall. What should have been done to make petitioner's returns more clearly reflect their true taxable income for these years was left undone, and petitioner has profited by this neglect.

But when this is said, the essential point remains, that the regulation's requirements for full information on comparative businesses and for amended returns sought merely to arrive at true income in those particular years, and did not remove from the possibility of taxation in a later year what was unquestionably income to the petitioner and which had thus far eluded taxation. The statute of limitations now makes correction of the earlier years impossible; the deductions for those years have become absolute; but income erroneously deducted does not alter its essential nature; and the moment that the unexpended balance of the reserve ceased to be properly held to meet a contingent liability of the petitioner, it reassumed its original character of income and was returnable as such in that year. This event, as we have said, occurred in 1933; and on this question then we hold for the respondent.

The deduction for taxes paid to the Dominion of Canada, conceded by respondent, will therefore be made on the basis of petitioner's gross income determined as above.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*