## NORTHWESTERN STATES PORTLAND CEMENT CO. v. HUSTON, Collector of Internal Revenue.

### No. 12015.

Circuit Court of Appeals, Eighth Circuit.

March 12, 1942.

---

WOODROUGH, Circuit Judge, dissenting.

Fred N. Furber, of Minneapolis, Minn. (Earl Smith and Smith & Beck, all of Mason City, Iowa, and Fowler, Youngquist, Furber, Taney & Johnson, of Minneapolis, Minn., on the brief), for appellant.

Michael H. Cardozo, IV, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., Maurice F. Donegan, U. S. Atty., of Davenport, Iowa, and Cloid I. Level, Asst. U. S. Atty., of Des Moines, Iowa, on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

This action was brought by the appellant to recover alleged overpayments of income taxes for the years 1932 and 1933, which resulted from the inclusion by the Commissioner of Internal Revenue in the appellant's gross income for the year 1932 of an item of $75,000 which in that year was transferred upon its books from a reserve account to surplus account. The sole question for decision is whether appellant realized taxable income as a result of the transfer. The trial court ruled that taxable income was realized, and entered judgment for the appellee, from which this appeal is taken.

The facts are not in dispute and are, in the main, covered by stipulation.

The appellant is an Iowa corporation which, as the result of a reorganization, succeeded to the business and assets and assumed the liabilities of a West Virginia corporation of the same name. For the purposes of this opinion, appellant may be regarded as having been at all times the proprietor of the business. Appellant will be referred to as the taxpayer.

The taxpayer was a large manufacturer of cement at Mason City, Iowa. The cement was usually sold in cloth sacks. The purchaser of a sack of cement paid for the cement and also for the sack. The taxpayer agreed to repurchase the sack at what it had cost the purchaser, if returned in usable condition. In order to repurchase sacks, the taxpayer was required to retain funds for that purpose. The value of sacks depreciated through use. To reflect upon its books the contingent liability to repurchase used sacks and the probable loss re-

sulting therefrom, the taxpayer in 1913 set up upon its books an account initially called "Reserve for Loss on Cloth Sacks Repurchased," and in later years "Reserve for Loss on Sacks." The amounts from time to time allocated to this reserve account were based upon the estimated number of cloth sacks which the taxpayer might be called upon to repurchase. A cloth sack usually cost the taxpayer ten cents, was sold for ten cents, and was repurchased for ten cents. A used sack shipped out was regarded as being worth five cents, and on the books that amount was credited to "inventory," five cents was credited to "Reserve for Loss on Sacks," and the customer was charged ten cents. When a used sack was returned, five cents was charged to "inventory," five cents was charged to the reserve, and ten cents was credited to the customer.

The amount in the reserve was intended to be sufficient to meet a charge of five cents per sack for all used sacks estimated to be outstanding and subject to repurchase. In 1913, when the reserve was set up, $18,867.50 was transferred to it from surplus, upon an estimate that there were then 377,350 used sacks subject to repurchase. In 1914 the taxpayer added $20,000 more to the reserve account to cover 400,000 additional sacks outstanding. Neither of these transfers was treated by the taxpayer as affecting in any way its income tax liability.

In 1916 the taxpayer transferred $10,000 from surplus to reserve to cover additional sacks subject to repurchase. This item of $10,000 it improperly charged to an account called "New Sacks Sales," which had the effect of indicating that the taxpayer's profits for that year were $10,000 less than they actually were, with the result that the taxpayer understated its taxable income for the year 1916 by that amount and underpaid its taxes by $200.

In 1917 the taxpayer transferred from surplus to reserve $100,000 to cover additional sacks subject to repurchase. This $100,000 item was erroneously charged to "Operations" on the taxpayer's books. In its tax return for that year, the taxpayer claimed a deduction for this amount as "Depreciation Charged Off." It is stipulated that:

"This return, together with the taxpayer's books and records were examined by the Commissioner. The basis for the handling of taxpayer's depreciation was gone over and revised. The $100,000 charged to 'Operations' on taxpayer's books and claimed as a deduction for income tax purposes in said depreciation account, on the face of the tax return, was eliminated as an item of depreciation deduction, but after the Commissioner had reviewed the books and accounts said item was allowed in the final adjustment of the 1917 taxes as a deduction on the basis of the charge to 'Operations.' This reduced the net income of that year after the depreciation adjustments, and resulted in an understatement of the tax liability for the year 1917 in the amount of $57,833.82."

Notations on the face of the taxpayer's return for the year 1916 show that it was reviewed by the Commissioner in 1923 and 1924, and that he determined an overpayment of $254.83. Notations on the returns for the years 1917 to 1920, inclusive, indicate that those returns were audited, a deficiency tax assessed, and a "voluntary payment to avoid institution of appeal by Govt. for the years 1917–1920, incl." was made. Notations on the taxpayer's returns for the years 1921 and 1922 indicate that there was a Field Audit of the returns for those years.

After the year 1917 there were no transfers of any amounts from surplus to reserve. After 1928, due to an increase in bulk sales of cement and the use of paper sacks, the number of used cloth sacks subject to repurchase by the taxpayer diminished. In 1932 the taxpayer estimated that, due to the decrease in the number of cloth sacks outstanding, the reserve was excessive to the extent of $75,000. It transferred upon its books that amount from reserve to surplus. It did not consider that that transfer had either increased its assets or decreased its liabilities. In making its return for that year, it did not report that item as income. Its return showed a net loss for 1932. The Commissioner, by adding the item of $75,000 to gross income, created deficiencies for the years 1932 and 1933, which the taxpayer paid. After its claim for refund was denied, this action was brought.

If the transfer of the $75,000 item was income to the taxpayer for the year 1932, the judgment of the trial court was right, but if the transfer did not create income, the taxpayer was entitled to judgment as prayed.

The taxpayer contends that the transfer which the appellee insists was income was

nothing more than a bookkeeping entry, and that it did not have the effect of either increasing assets or decreasing liabilities. The position of the appellee is not entirely clear. He is of the opinion that, under the circumstances, the restoration in 1932 of $75,000 to surplus from the reserve account ought to be regarded as having produced taxable income in that year. He asserts, in substance: (1) that the maintenance of the reserve did in fact result in a decrease of the tax liability of the taxpayer in former years, and that when the $75,000 item was restored to surplus in 1932, the transfer was to be regarded as having reduced the amount of the taxpayer's liabilities in that year to that extent; (2) that, since in 1916 and 1917 the taxpayer took deductions for the amounts transferred to the reserve account in those years, and thereby secured tax advantages, it would be inequitable to permit the taxpayer to treat the transfer made in 1932 as anything but income for that year; (3) that the reserve resembled a bad debt reserve which was deductible under the applicable law; (4) that the restoration of surplus on the taxpayer's books resulted in a financial advantage, since (a) it gave to the taxpayer the use of income on which it had paid no tax, and (b) after the transfer, the balance sheet of the taxpayer reflected a stronger financial position; (5) that appellee is not attempting to collect taxes barred by limitation, but is only trying to secure the correct amount of taxes for the years 1932 and 1933, and that he "does not rely on an underpayment of an earlier year to justify the denial of the refund, but maintains that the amount involved would be income whether the original deductions were proper or not."

Bookkeeping entries do not produce either income or losses for the purposes of taxation. They are intended to record facts, and are evidential, but they do not create or destroy facts. "The bookkeeping creates nothing, and the question must be decided according to proven and established facts." Sitterding v. Commissioner, 4 Cir., 80 F.2d 939, 941. The decision in this case must rest not upon the bookkeeping methods employed by the taxpayer but upon the actual facts, which are not in dispute. See Doyle v. Mitchell Brothers Co., 247 U.S. 179, 187, 38 S.Ct. 467, 62 L. Ed. 1054, and Commissioner v. North Jersey Title Ins. Co., 3 Cir., 79 F.2d 492, 493.

The account "Reserve for Loss on Sacks" was not a reserve required or recognized by law, the additions to which from income in any year were deductible in determining the tax liability of the taxpayer for that year. This is conceded. Therefore, the existence of the reserve on the taxpayer's books and the transfers to that account from surplus had no legal effect whatever upon its liability for taxes. For the purposes of determining tax liability the account "Reserve for Loss on Sacks" was a part of the taxpayer's surplus account, and nothing more. The reserve account was, in effect, merely a bookkeeping device to indicate what amount of surplus should prudently be kept on hand to care for the taxpayer's contingent liability to repurchase cloth sacks and to cover losses resulting therefrom.

The Board of Tax Appeals has considered the effect of additions of income to, and restorations of income from, reserve accounts. In Peabody Coal Co. v. Commissioner, 18 B.T.A. 1081, 1091, affirmed 7 Cir., 55 F.2d 7, the Board said, speaking of the reserves involved in that case:

"* * * If they were not reserves of the kind that are recognized as proper deductions from income by the several revenue acts, they should have been restored to the petitioner's income in the years in which they were made. If they are reserves the net additions to which are allowable as deductions from income, then the unexpended balances became income to the petitioner in the year in which the reason for which they were created ceased to exist, which was in 1922."

In G. M. Standifer Construction Corp. v. Commissioner, 30 B.T.A. 184, 187, in considering a reserve set up to meet litigation, the Board said:

"* * * We further held in the Peabody Coal Co. case that reserves of a kind that are not recognized as constituting allowable deductions should be restored to income in the year in which they were set up."

In Creamette Co. v. Commissioner, 37 B.T.A. 216, 221, the Board said, in referring to the Standifer and Peabody Coal Co. cases:

"The rule to be drawn from these cases appears clearly to be that amounts set up by a taxpayer on his own responsibility and without authority granted by statute or regulation in order to meet a contingent liability, being set up out of income received in a particular year, are, if the liability is not realized in that year, to be

'restored to income in the year in which they were set up.' G. M. Standifer Construction Corporation [v. Commissioner], supra [30 B.T.A. 184] at page 187. Such reserves may not be deducted in anticipation of the realization of the liability, and the failure to realize the liability in any particular year restores immediately to the income of that year the amount withheld from income for the purpose in that year. But reserves set up and added to year by year, which may be deducted by authority of statute or regulation, are obviously in a different category. Statutory permission to deduct presently a reserve in anticipation of a contingent liability does not contemplate, however, an absolute deduction beyond the possibility of correction should the liability never be realized. It likewise is subject to adjustment on the whole balance of reserve against loss or expense. We do not understand petitioner to deny this. But since the deduction is absolute for the particular year in which it is allowed, the unexpended balance of the reserve is not restored to income by its redistribution through the past years in which the income was realized but is treated as new income realized in the year in which the extent of the liability is finally determined. Cf. Burnet v. Sanford & Brooks Co., 282 U.S. 359 [51 S. Ct. 150, 75 L.Ed. 383]; Commissioner v. Liberty Bank & Trust Co. [6 Cir.], 59 F.2d 320."

We do not understand that the appellee seriously questions the correctness of the ruling of the Board that additions from income for a particular year to a nondeductible reserve constitute income for that year;[1] but he calls attention to the case of Commissioner v. Dallas Title & Guaranty Co., 5 Cir., 119 F.2d 211, which reviewed a decision of the Board (40 B.T.A. 1022). The case was returned to the Board with directions to take additional evidence on the issue of estoppel. That case dealt with transfers from an unearned premium reserve of a title insurance company to "undivided profits," and it appeared that the reserve was presumably required by Texas law, that the taxpayer had taken deductions for the additions made to the reserve fund, and that, by the applicable Revenue Act, the taxpayer was permitted to take such deductions if the additions to the reserve were required by law. It also appeared that the taxpayer and the Commissioner, in computing its income tax liability, had treated the additions to reserve as representing unearned premium liability and had considered the reserve to be a deductible reserve. The controlling question in that case apparently was whether the taxpayer had misrepresented, to the prejudice of the Government, the facts with respect to the reserve and the additions to it and had thereby estopped itself from claiming that the transfers to undivided profits were from a nondeductible reserve.

■■ We think it is clear that in the case at bar the additions to reserve in the years 1916 and 1917, being legally nondeductible, represented taxable income for those years, and that the restoration to surplus made in 1932 was not taxable income for that year.[2]

But it is argued that, since the taxpayer erroneously reduced its taxable income in the years 1916 and 1917 by taking deductions for the additions to this reserve account, which resulted in underpayments of taxes for those years, the reserve account should not be treated as what it actually was, a nondeductible reserve, but should be considered a deductible reserve. It is our understanding that the appellee does not contend that the taxpayer ever misrepresented to the Commissioner of Internal Revenue any facts with respect to the character of the reserve account, or that the Commissioner, in reviewing and auditing the taxpayer's returns and books, did not ascertain the nature of the liabilities which the reserve account was set up to reflect. The only conclusion which we think can reasonably be drawn from the evidence is that the taxpayer mistakenly took, and the Commissioner mistakenly allowed it to take, deductions in the years

---

[1] See Lucas v. American Code Company, Inc., 280 U.S. 445, 452, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; Brown v. Helvering, 291 U.S. 193, 199, 54 S. Ct. 356, 78 L.Ed. 725; Readers' Pub. Corp. v. United States, Ct.Cl., 40 F.2d 145, 148; Massachusetts Mut. Life Ins. Co. v. United States, Ct.Cl., 56 F.2d 897, 899–901.

[2] Any profits from the sales of sacks which might have been reflected in the reserve, were taxable in the years in which the sales were made. La Salle Cement Co. v. Commissioner, 7 Cir., 59 F.2d 361, certiorari denied 287 U.S. 624, 53 S.Ct. 79, 77 L.Ed. 542. There is no evidence that the taxpayer realized any profits from sales of sacks in 1932.

1916 and 1917 on account of additions to a nondeductible reserve. The circumstance that the taxpayer thus escaped paying taxes on income which was clearly taxable in the years 1916 and 1917, and that the Commissioner failed to discover that circumstance and failed to collect the full amount of the taxpayer's liability for those years, would not alter the fact that the additions to the reserve represented taxable income of the taxpayer for the years 1916 and 1917 on which taxes legally accrued. The situation, as we see it, is that there are barred deficiencies in income taxes for the years 1916 and 1917 which the appellee is now trying to use to convert what was not taxable income for the year 1932 into taxable income for that year.

In McEachern v. Rose, 302 U.S. 56, 62, 58 S.Ct. 84, 87, 82 L.Ed. 46, it was held to be the intent of Congress "to require refund to the taxpayer of an overpayment, even though he has failed to pay taxes for other periods, whenever their collection is barred by limitation."

Our conclusion is that the transfer on the taxpayer's books in the year 1932 of the item of $75,000 from the reserve account of the taxpayer to its surplus account did not for tax purposes result in either an increase in the taxpayer's assets or a reduction in its liabilities, and that the transfer did not produce taxable income.

The judgment appealed from is reversed, and the case is remanded with directions to enter judgment in favor of the taxpayer.

WOODROUGH, Circuit Judge, (dissenting).

Incident to its cement business this taxpayer carried on the buying and selling of cement sacks over a long period of years on a large scale, and it recorded that part of its business by bookkeeping entries. The entries purported to inform the company and the government of the varying results in dollars and cents accruing to the company from its operations in cement sacks. There has been no attempt to contradict the bookkeeping disclosure by resort to any kind of physical checking or otherwise. Therefore if it was a fair inference from the book entries (as illuminated by the witnesses) that the taxpayer's asserted deficiency for 1932, as determined by the Commissioner, then existed, the judgment appealed from should be sustained. If such an inference could not be fairly drawn from the company's books, the judgment should be reversed.

As the taxpayer aimed to sell its cement sacks at cost and to buy old sacks back at the cost price of new sacks, it figured its sack business as a whole must result in expense or loss to it, and it set its books up on that theory. Perhaps it could not in the nature of things, and at least it did not, make a bookkeeping set up that would show the extent of the expense or loss attributable to sack operations exactly at any particular time, or even in every tax year. It merely adopted a schedule for estimating its probable loss, and over a long period it carried the amounts resulting from the estimates in a separate account called a reserve account, as one of the liabilities of the company.

In certain years an increasing of the sums shown in the account during those years effected a substantial reduction of the company's income tax. But in the tax year here involved there was a determination by the company on consideration of the actual working out of the cement sack operations that the amount shown in the account as a company liability attributed to the sack business had become too large by $75,000. It recorded its determination by entering the $75,000 as a reduction of the company liability shown in the account. There is no hint of bad faith. So far as appears, the company honestly believed that it had become $75,000 richer at that time because the operations in the cement sack part of its business had washed out or extinguished that much of the company's liabilities. I think the trial court rightly decided that such increase in the company's wealth gained from its business was properly added to gross income for taxation.

It is true there was no single cement sack transaction which enriched the company to the extent of $75,000 at the time of the entry, and, of course, income must be taxed strictly in respect to the year when it accrues. But many incomes result from imperceptible accretions and the time of the accrual is fixed as of the time when acts are done or determinations are made in respect to them. Here the changes of conditions in the cement sack business which would occasion gain or loss to the taxpayer were always intangible, and during considerable periods inappreciable. No one ever pretended to know of his own knowledge how many old sacks were in existence or how many would be brought

in for redemption at the price of new sacks at any particular time. It was on that account that the company chose to record its cement sack business in its books on the basis of estimated data. The bookkeeping plan contemplated that from time to time determination would be made to reduce the estimates to greater certainty. The bookkeeping set up was no less valid on that account, but it necessarily resulted that the date of accrual of loss or gain was the date when there was a determination and entry of increased or diminished liability attributable to the business in cement sacks. In some years that bookkeeping set up showed no tax incidents at all. Probably none were clearly discernible in those periods. In some years there was tax advantage to the company on account of increased burdens from the cement sack business. In the year in question here the company determination on the operations of the cement sack business results, in a tax. But the bookkeeping method appears to have been honestly adopted and carried out, and there is nothing to show that in the long run either the taxpayer or the government would be wronged by it. I see no reason whatever to doubt that the company's gain of $75,000, which it disclosed by the reduction of its liability ascertained and recorded in its bookkeeping in 1932, was honest and actual.

What is there against the book showing? It is not asserted that the company had merely a capital investment in cement sacks instead of an active continuing business in that commodity, and there is no claim that the company could or did carry on its buying and selling of sacks from day to day over the years, running up into the millions, without any income tax effect upon the company. Appellant's point seems to be related entirely to the naming or characterizing of the account that shows the $75,000 entry in respect to the cement sack business in 1932, and the argument leads up to calling that account a "non taxable reserve". Appellant's thought appears to be that with that name on it the entries in it cannot be considered to arrive at the company's income for tax in 1932. Necessarily, by the same reasoning it could not be considered in other years. And so, as there is and apparently need be no other account to show the fluctuations of the cement sack business, that business may go on to great extent without ever causing any income tax effect upon the taxpayer.

No doubt many producers like this taxpayer carry on large businesses in the containers of their products. Probably many also make it their policy to minimize differences between their costs and receipts in respect to such containers. But it is not credible that absolute parity is attained. Such activities are bound to result, as they have in this case, in fluctuating monetary advantage and disadvantage affecting income tax.

The thing that is really important about the account in question here is not the name of it, but the fact that it was the account and the only account kept by the company which was intended and which was adapted to show the fluctuations in the company's cement sack business and to indicate in figures, as near as may be, the extent of the advantage or disadvantage accruing to the company from the sack operations, the increase or decrease of the company's liabilities—in tax parlance, the gain or loss. It appears to have informed the company sufficiently for all its business purposes, and as it was honest, I think that no matter what it may be called it ought also to measure taxation.

It does not seem to me that the decision here should be controlled by action or inaction of the tax authorities in respect to the account in the distant past. The extensive business in cement sacks was continuously carried on by the taxpayer and it necessarily had tax consequences. Those for the year 1932 being shown by plain book entry not contradicted or impeached by other evidence, taxation should follow accordingly. I would affirm.