Allenberg International Cotton Co. v. Commissioner.
Allenberg International Cotton Co. v. Commissioner
Docket No. 4320-70.
United States Tax Court
T.C. Memo 1972-152; 1972 Tax Ct. Memo LEXIS 105; 31 T.C.M. (CCH) 757; T.C.M. (RIA) 72152; July 17, 1972
Kenneth F. Clark, Jr., 4700 First Nat'l Bank Bldg., Memphis, Tenn., for the petitioner. Jack D. Yarbrough and Richard J. Neubauer, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies with respect to petitioner's Federal income taxes: Taxable Year Ended
Amount
April 30, 1964
$ 12,581.13
January 31, 1966
54,023.33
January 31, 1967
125,241.31
January 31, 1968
114,811.53
In his brief respondent has conceded that interest-free advances did not generate interest income allocable to petitioner under section 482, Internal Revenue Code of 1954. The two issues remaining for decision are: (1) Whether petitioner is entitled to certain deductions for costs of goods sold for *106 the taxable years ended January 31, 1966, 1967, and 1968; and (2) whether petitioner is entitled to a net operating loss deduction for the taxable year ended April 30, 1964, by reason of a net operating loss carry-back from the taxable year ended January 31, 1967. The resolution of the second issue depends upon our decision concerning the first issue. Findings of Fact Some of the facts have been stipulated and are found accordingly. Only those findings of fact which are necessary for the disposition of the remaining issues are set forth herein. 758 The petitioner was incorporated in the name of Allenberg International Cotton Company (herein called Allenberg) on May 4, 1959, under the laws of the State of Tennessee for the purpose of merchandising foreign grown cotton to foreign buyers. Since that time, Allenberg has been continuously engaged in such merchandising. At the time of filing its petition in this proceeding, Allenberg's principal office was located in Memphis, Tennessee. It filed its Federal corporation income tax returns for the years in controversy with the district director of internal revenue at Nashville, Tennessee. Allenberg purchases some cotton in South *107 and Central America, but its principal source is Mexico. All such cotton is purchased exclusively for sale in foreign markets, i.e., in Europe and the Far East. Algodonera Comercial Allenberg S.A. (herein called ACASA) is a foreign corporation that was organized under the laws of the Republic of Mexico for the purpose of financing, ginning, and merchandising Mexican grown cotton. ACASA's principal place of business is Tampico, Mexico. All of the capital stock of ACASA was acquired by Allenberg on February 10, 1964, at a cost of $480,000. ACASA has remained a wholly-owned subsidiary of Allenberg throughout the years here involved. The company employs thirty to forty persons "full time" and up to 300 persons during the ginning season. Approximately 15 to 20 percent of ACASA's cotton is sold to Mexican mills. The balance is exported. The domestic Mexican sales are conducted through Mexican selling agents who contact customers, handle collections, and settle weight and quality complaints. For these services the Mexican agents receive $1 to $1.25 a bale, the equivalent of 1/5 to 1/4 cent per pound or 20 to 25 "points" per pound. [1]
*108 In addition to the capital investment in ACASA, Allenberg loaned ACASA amounts needed to finance Mexican farmers' cotton crops and for other purposes. Such advances were made on an unsecured basis and without any written obligation to pay interest. In 1965, Allenberg and ACASA entered into an agreement whereby Allenberg would handle all of ACASA's export cotton for a fixed fee of 1/2 cent per pound (50 points) or approximately $2.50 per bale. The agreement provides as follows: ACASA agrees to furnish ALLENBERG with all of its export cotton from the current crop for the purpose of classing, selling and shipping to ultimate buyers. AND ALLENBERG agrees to sell and supervise classing and shipment of all of ACASA's current export cotton crop for a fee of 1/2 per pound (approximately $2.50 U.S. per bale). In addition to taking full responsibility for the marketing and collecting for ACASA's export cotton, ALLENBERG pays all expenses in connection with performing this service except foreign selling agents' commission, bank's collection fees, costs involved in placing cotton aboard ship, etc. ACASA hereby authorizes Allenberg to make such sales of its export cotton as their judgment *109 dictates and agrees to deliver cotton for fulfillment of such sales - whether market is higher or lower than sales price at time of shipment. This contract is to become operative May 1, 1965, and run until January 31, 1966. Thereafter it is to be automatically renewed from year to year unless cancelled by either party on sixty days' notice. In case of any differences of opinion regarding contract which cannot be mutually agreed upon, the matter is to be settled by arbitration. The contract fee of 1/2 cent per pound actually represented a 1/4 cent per pound selling commission and a 1/4 cent per pound payment in lieu of interest on advances by Allenberg to ACASA. [2] The 1/4 cent per pound selling commission was equal to or greater than the commission paid by ACASA to domestic Mexican agents for similar services. Such commission was also greater than that charged by Allenberg for handling the export cotton of a large Columbian cooperative, Corporation Algodonera de Litoral. A commission of 1 1/4 cents per pound or approximately $6.25 per bale has never been paid by ACASA to any agent. A commission in that amount would have been unreasonable. Outside the 1965 agreement, no other *110 service was to be performed by Allenberg and no other compensation was to be received by it. 759 During the years in question Allenberg handled ACASA's export cotton in accordance with the provisions of the 1965 agreement. The parent and the subsidiary also agreed, however, that ACASA should set aside a fund in the United States to insure against the possibility of expropriation and/or devaluation of the Mexican peso. There were sound business reasons for doing so. The plan was for ACASA to underinvoice its cotton to Allenberg. The amount by which their contract purchase price was understated was to be credited to ACASA's account on Allenberg's books and held for ACASA. To accomplish this, ACASA invoiced cotton to Allenberg at 1 1/2 cents per pound below the foreign resale price (shipside Tampico, Mexico), 1 cent per pound below the contract *111 price reached in the 1965 agreement. The amount of the understatement thus equaled 1 cent per pound. On Allenberg's books each transaction was recorded by debiting the cotton purchases account with the understated invoice amount and crediting a subsidiary ledger marked "ACASA Cotton Invoices." All transactional postings to the latter account were accumulated and summarized semiannually on January 31 and July 31, by number of bales, weight in pounds, and invoice amounts; the aggregate balances were credited to ACASA's regular advances account. Simultaneously, on each January 31 and July 31, the 1 cent per pound understatement of invoice price was adjusted on Allenberg's books by debiting to Allenberg's cotton purchases expense account a sum equal to 1 cent per pound times the number of pounds of cotton invoiced by ACASA to Allenberg during the preceding six-month accounting period. A corresponding credit was then made to the liability account marked "ACASA - Margin Deposit v. Loans." These bookkeeping entries and adjustments properly reflected a gross profit for Allenberg on each transaction of 1/2 cent or 50 points per pound. The above-described Margin Deposit account, which was *112 created by Allenberg's retention of a portion of the amount due for cotton purchased, resulted from the sale of the cotton and belonged to ACASA. As such, the account showed a liability owing to ACASA. The true nature and purpose of the Margin Deposit account was fully disclosed to Allenberg's bankers and auditors. Sale Number 6045 is illustrative of sales made during the relevant period: It was made on September 22, 1965, by Allenberg to T.A. Kuempers, Rhine, Germany, through Allenberg's broker, Dieterich & Co. The sale was for 400 bales - 200 bales were to be delivered in November and 200 bales in December 1965. A memo card showing the foregoing information was prepared by Allenberg's foreign sales manager. It also showed that the price to the buyer was 27 cents per pound and noted parenthetically that this price was the equivalent of 23.64 Conversion of buyer's price to shipside price was made at the time the order was taken and represented an adjustment for all shipping expenses from point of sale (Tampico, Mexico) to buyer's port of entry (Bremen, Germany). A copy of this memo card was furnished by Allenberg to ACASA at the time of the sale. Allenberg then prepared a "sale *113 confirmation" containing the details of the transaction and forwarded one copy to its broker in Germany and one copy to ACASA. Allenberg employees also made the following computation with regard to the 200 bales to be shipped in November 1965: $27,496.80
27.0000 CIF, COA plus 5 days
Gross/
(200 Bales Inv.
137.48
.1350
Agents Selling Commission
#MT-1229/6045
2,151.47
2.1126
Ocean Frt & Mex Tax thereon
to Germany
96.03
.0943
Marine Insurance
12-29-65)
809.83
.7952
Tare, less Franchise
40.00
.0393
Controller
51.56
.0506
Bank Chges, 1/ 8 US & 1/16fgn.
135.45
.1330
Interest at 5 1/2% for 43 days
$ 3,421.82
3.3600
TOTAL EXPENSES
$24,074.98
23.6400 Shipside Price advised to ACASA NET
-1,085.03
-1.5000
$22,989.95
22.1400 Amount of ACASA's Invoice to AICC. The 1.5000 cents subtracted from the shipside price of 23.6400 cents is comprised of a.50 cents "contract fee" and a 1 cent "set aside" or "understatement." Allenberg next prepared shipping instructions dated November 8, 1965, for the 200 bales of cotton to be loaded at Tampico. The shipside price was 23.64 cents per pound. 760 ACASA's *114 invoice to Allenberg covering this portion of Sale Number 6045 set forth such details as to number of bales, marks, gin weight, etc. The invoice is for 22.14 cents per pound. Allenberg's invoice to the German buyer shows a price of 27 cents per pound. Sale Number 6045 of 200 bales at an invoice price of $22,989.95 or 22.14 cents per pound was posted on Allenberg's books debiting cotton purchases and crediting ACASA's cotton invoice account. At this point, the cotton purchases expense account was actually understated by approximately 1 cent per pound. During the short year, May 1, 1965, to January 31, 1966, Allenberg purchased from ACASA and resold for its account 10,821,450 pounds of cotton. Adjustments to the cotton purchases account and the Margin Deposit account for that year amounted to $108,214.50. During the fiscal year ended January 31, 1967, Allenberg purchased from ACASA and resold for its account 25,209,408 pounds of cotton. Adjustments to Allenberg's purchases account and Margin Deposit account for that year amounted to $252,094.08. During the fiscal year ended January 31, 1968, Allenberg purchased from ACASA and resold 11,909,142 pounds of cotton. Adjustments *115 to the cotton purchases expense account and the Margin Deposit account for that year amounted to $119,691.42. On Allenberg's Federal income tax returns for the years ended January 31, 1966 and 1967, receivables from ACASA were reduced by the amount retained in the Margin Deposit account to show the net receivables due from ACASA. As of January 31, 1968, the balance accumulated in the Margin Deposit account was $480,000. On that date the full balance was credited to ACASA in reduction of its regular advances account. Where this was done, ACASA chose, for Mexican tax purposes, to credit capital rather than report the item as sales income. [3] The credit on Allenberg's books nevertheless did not constitute a contribution to ACASA's capital by Allenberg. On July 31, 1969, a similar accumulation in the Margin Deposit account was credited to ACASA's regular advances account and on that occasion ACASA, because it had large operating loss carryovers, chose to credit sales rather than capital. Reporting the item correctly in this instance did not result in the incurrence of any Mexican tax liability. On its returns for the taxable *116 years at issue, the petitioner corporation treated the amounts debited to its cotton purchases account and credited to the Margin Deposit account (i.e., the understated invoice amount of 1 cent per pound of cotton sold) as a cost of goods sold. The respondent determined that such addition to the cost of goods sold was improper. In his "Explanation of Items" accompanying the statutory notice of deficiency, respondent stated: During the taxable years ended January 31, 1966, January 31, 1967, and January 31, 1968, you owned or controlled all the stock of a Mexican corporation, Algodonera Commercial Allenberg, S.A., sometimes referred to by its initials "ACASA." The deductions claimed for cotton purchases on your returns for these years included amounts resulting from journal entries in which the account, or accounts, accumulating cotton purchases were debited with resulting credits to an account sometimes referred to as "ACASA - Margin Deposit against Loans." It is determined that as to these entries no purchase was made or intended, no liability was incurred, and that the purpose of the entries was to create a reserve, hedge, or security against the possible expropriation of the assets *117 of the Mexican corporation (ACASA) by the Mexican government. It is also determined that such reserve additions do not constitute allowable costs of sales or deductions. Therefore, the amounts posted to the account, or accounts, and deducted in your returns, as shown below, are disallowed and your taxable income for each of these years is increased accordingly. Opinion Respondent contends that the amounts debited to Allenberg's cotton purchases expense account and credited to the Margin Deposit account were derived from Allenberg's sales income and belonged to Allenberg alone. The Margin Deposit account, he argues, was a contingent reserve against the possibility of expropriation and payments to it are nondeductible. The petitioner corporation contends that the disputed amounts belonged to its Mexican subsidiary, ACASA, 761 and were a part of the sales price paid by Allenberg for ACASA's cotton. The Margin Deposit account was a liability account representing amounts owed by Allenberg to ACASA. The funds were held for ACASA outside of Mexico for reasons that benefited ACASA primarily. Since we agree with the petitioner, we hold that the amounts credited to ACASA's Margin Deposit *118 account, and later credited to ACASA's regular advances account, are deductible by petitioner as a cost of goods sold. The pivotal question is to whom did the disputed amounts belong. Were these amounts profits to Allenberg upon the sale of cotton at the shipside price less 1 1/2 cents per pound, as would appear from ACASA's invoices to Allenberg? Or were these amounts a "set aside" from the fruits of the sale between ACASA and Allenberg? We think they were the latter. ACASA and Allenberg conducted their mutual business within the confines of the 1965 agreement which called for a fee of 1/2 cent per pound. Allenberg had no right to receive any additional compensation. The Margin Deposit consisted of amounts to which ACASA had the strongest claim of right. The account bore ACASA's name: It was designated "ACASA-Margin Deposit v. Loans." The fact that this account was a liability account was disclosed to Allenberg's bankers and auditors. The account's true nature, therefore, was that of a reserve benefiting ACASA. We need not determine whether it was a so-called contingent reserve because the question of the deductibility of ACASA's contributions to it is not before us. [4] Also, the *119 fact that Allenberg ultimately benefited - in the manner that any parent that is owed money by its subsidiary is benefited when the subsidiary insures itself against possible losses - is not determinative under these circumstances. Likewise, it makes no difference that the amounts were never physically remitted to ACASA but were merely credited to ACASA's regular advances account on Allenberg's books. Respondent, on brief and at trial, emphasized the fact that on one occasion ACASA treated petitioners' transferral of funds from the Margin Deposit account to the regular advances account as a credit to capital on its (ACASA's) books. This, he argues, is proof of the true character of the transaction. While we agree that book entries are evidential, we cannot agree that they are controlling. See, e.g., Doyle v. Mitchell Brothers Co., 247 U.S. 179, 187 (1918); *120 Sitterding v. Commissioner, 80 F. 2d 939, 941 (C.A. 4, 1936) ("The bookkeeping creates nothing, and the question must be decided according to proven and established facts."); Welp v. United States, 201 F. 2d 128, 130-31 (C.A. 8, 1953); Northwestern States Portland Cement Co. v. Huston, 126 F. 2d 196 (C.A. 8, 1942); Estate of Lashells' v. Commissioner, 208 F. 2d 430 (C.A. 6, 1953). We think that, in fact, the funds represented income to ACASA, not Allenberg. That ACASA disguised the receipt of this income - as it disguised the payment of interest - is a matter which does not concern us. We are satisfied from the exhibits and the evidence introduced at trial that the disputed amounts belonged to ACASA and were properly deducted by petitioner as a cost of goods sold. We so hold. See and compare Columbian Rope Co., 42 T.C. 800 (1964). As to the second issue, it follows that petitioner is entitled to the net operating loss carryback to the taxable year ended April 30, 1964. Decision will be entered under Rule 50. Footnotes
1. In the cotton merchandising business, 100 "points" equals 1 cent per pound or $5 per bale.↩
2. The 1/4 cent per pound payment was not labeled as interest because the Mexican Government did not allow a deduction for interest paid to foreign lenders. By disguising the interest charge as something other than interest, ACASA was able to obtain the deduction of 1/4 cent per pound or $1.25 per bale on all cotton sold to Allenberg.↩
3. ACASA thus evaded the Mexican tax on sales income.↩
4. Although the question is not presented, we have read with interest the remarks of Mr. Santamarina, "Mexican Tax Incentives For 'Mexicanized' Companies," 25 The Tax Lawyer 419 (1972): For more than 30 years, since the expropriation of the oil companies by the Mexican Government in 1938, there has been no expropriation of a Mexican private company that I know of.↩